In the Supreme Court of Georgia

Decided:   July 5, 2016

S15G1571.  DOCTORS HOSPITAL OF AUGUSTA et al. v. ALICEA, ADMINISTRATRIX.

NAHMIAS, Justice.

In March 2012, Jacqueline Alicea's 91-year-old grandmother, Bucilla Stephenson, died at the end of a two-week stay at Doctors Hospital of Augusta, LLC ("Hospital").  In May 2013, Alicea, acting as the administratix of her grandmother's estate, sued the Hospital and Dr. Phillip Catalano (collectively, "Defendants").  Alicea alleged among other things that they intubated her grandmother and put her on a mechanical ventilator, which prolonged her life when she was in a terminal condition and caused her unnecessary pain and suffering, contrary to her advance directive for health care and the specific directions of Alicea, her designated health care agent.  The Defendants filed a motion for summary judgment, arguing among other things that OCGA § 31-32-10 (a) (2) and (3), a part of the Georgia Advance Directive for Health Care Act ("Advance Directive Act" or "Act"), see Ga. L. 2007, p.133, provided them

immunity from liability. The trial court rejected the immunity argument and denied summary judgment on that ground.

On interlocutory appeal, the Court of Appeals affirmed the portion of the order denying immunity. See Doctors Hospital of Augusta, LLC v. Alicea, 332 Ga. App. 529, 536-543 (774 SE2d 114) (2015). This Court then granted the Defendants' petition for certiorari to review that aspect of the Court of Appeals' decision. As explained below, we endorse much of what the Court of Appeals said about the immunity analysis in Division 1 of its opinion, although we conclude that the court skipped over one important point. The correct analysis makes it even clearer, however, that the Defendants were not entitled to summary judgment based on their claim of immunity under OCGA § 31-32-10 (a) (2) and (3), and we therefore affirm the Court of Appeals' judgment as to that issue. See WMW, Inc. v. Am. Honda Motor Co., 291 Ga. 683, 683 (733 SE2d 269) (2012) (affirming the Court of Appeals' judgment on certiorari under the right-for-any-reason doctrine).

1.    Because we are reviewing a motion for summary judgment, we must

construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences. The party opposing summary judgment is not required

2

to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact. Our review of the grant or denial of a motion for summary judgment is de novo.

Nguyen v. Southwestern Emergency Physicians, P.C., 298 Ga. 75, 82 (779 SE2d 334) (2015) (quotation marks and citation omitted). Viewed in this way, the record shows the following.

(a) On November 12, 2009, Stephenson, who was then 89 years old, executed an advance directive for health care ("Advance Directive"), designating as her health care agent Alicea, the granddaughter with whom she lived. The Advance Directive specified that Alicea was "authorized to make all health-care decisions for me, including decisions to provide, withhold, or withdraw artificial nutrition and hydration, and all other forms of health care to keep me alive." The Advance Directive also said:

> My agent shall make health-care decisions for me in accordance with this power of attorney for health care, any instructions I give in this form, and my other wishes to the extent known to my agent. To the extent my wishes are unknown, my agent shall make health-care decisions for me in accordance with what my agent determines to be in my best interest. In determining my best interest, my agent shall consider my personal values to the extent known to my agent.

> Stephenson repeatedly told her family members that "she was ready to go

3

when the good Lord called her," and said "when it's my time, it's my time, don't prolong it." She told Alicea specifically that "[s]he did not want . . . to rely on a machine to have to live," including a ventilator to breathe for her. In 2007, Alicea's 80-year-old father had died at the Hospital after entering it with pneumonia and without an advance directive or other document concerning end-of-life decisions. Because Alicea's mother had Alzheimer's disease, Alicea ultimately had to make the decision to take her father off a ventilator. Stephenson did not want Alicea to have to make that kind of decision about her. In the paragraph of the Advance Directive addressing "end-of-life decisions," Stephenson initialed the option that said:

> Choice NOT to Prolong Life.
> I do not want my life to be prolonged if (1) I have an incurable[] and irreversible condition that will result in my death within a relatively short time, (2) I become unconscious and, to a reasonable degree of medical certainty, I will not regain consciousness, or (3) the likely risks and burdens of treatment would outweigh the expected benefits.

(b) Two years passed. Then, around February 28, 2012, Stephenson developed a persistent cough. On Saturday, March 3, she woke up lethargic; she was minimally responsive and had urinated on herself. After Alicea and her husband assisted Stephenson in sitting up, she became more

4

aware, and they helped her to the bathroom to clean up. As Alicea was bathing her, Stephenson lost control of her bowels, and her eyes rolled toward the back of her head. Alicea and her husband feared that Stephenson was having a stroke and drove her to the Hospital's emergency room; Alicea brought the Advance Directive with her.

Blood tests and a chest x-ray showed that Stephenson was suffering from pneumonia, sepsis, and acute renal failure, and she was admitted to the Hospital. Alicea gave the Hospital the Advance Directive, which was placed in Stephenson's medical record, but not in the front behind the admission tab as required by hospital policy to ensure its ready availability to all doctors and hospital staff. Alicea also gave the Hospital her contact information, including her home, work, and cell phone numbers and her husband's cell phone number, so that she could be reached whenever she was away from the Hospital. Alicea has presented evidence showing that from the time Stephenson arrived at the Hospital, she was unable or chose not to make significant health care decisions for herself, triggering Alicea's authority to make those decisions pursuant to the Advance Directive.

Around 9:00 a.m. the next day, Dr. Catalano, a surgeon with staff

privileges at the Hospital, called Alicea to tell her that he was taking care of Stephenson and that she was being moved to the intensive care unit ("ICU"). Dr. Catalano said that he planned to perform a computed tomography ("CT") scan to better assess her condition. Alicea did not object to the CT scan, but she told Dr. Catalano about Stephenson's Advance Directive and specifically instructed that "by no means was CPR [cardio-pulmonary resuscitation] to ever be administered" and that "no heroic measures were to be used" to prolong Stephenson's life.

Around 2:30 p.m., Dr. Carmel Joseph, an ICU physician, called Alicea to give her the results of the CT scan and ask her to consent to a right chest thoracentesis, which would involve a small incision and the insertion of a tube into Stephenson's chest to drain infection from her lung; this procedure does not involve intubation.[1] Alicea consented to the procedure but repeated her earlier instructions to Dr. Catalano that "no heroic measures" were to be used and that Stephenson was not to be given CPR. Dr. Joseph asked Alicea about ventilation specifically, and Alicea directed him to call her before intubating Stephenson

---

[1] Intubation involves passing a plastic tube through the mouth and down into the airway. The plastic tube is then connected to a mechanical ventilator that controls the patient's breathing. See Alicea, 332 Ga. App. at 532 n.2.

and putting her on a ventilator. Pursuant to the Hospital's policy requiring physicians to document in the patient's medical chart any discussions with the designated health care agent about an advanced directive, Dr. Joseph wrote twice in his progress note that Stephenson was "no CPR" and that Alicea had to be called "before patient is intubated."[2]

On Monday morning, March 5, Dr. Catalano called Alicea and requested her verbal consent for a "surgical" thoracentesis to drain more fluid from Stephenson's lung cavity. He explained that he would make an incision to insert a tube for drainage and that Stephenson would be under general anesthesia, which Alicea understood to mean that she would essentially be asleep during the procedure. Dr. Catalano had not read the Advance Directive or the progress notes in Stephenson's medical chart; he did not tell Alicea, and she did not know, that this procedure would require intubation and the use of a ventilator.

---

[2] The Hospital's policy regarding advance directives required that a copy of the Advance Directive be placed in the front of Stephenson's medical record under the admission tab; required the charge nurse to notify physicians of the existence of the Advance Directive and to discuss with them any communications or concerns voiced by the patient or the designated health care agent; required physicians to document in the medical chart progress notes any discussions with the patient or the health care agent regarding the Advance Directive; required hospital personnel to "ensure appropriate staff is aware of" the Advance Directive and to have a mechanism to honor it; and required the nursing staff to confirm the instructions in the Advance Directive and document this action during the initial assessment and to reconfirm the instructions and document this action on any transfer within the facility.

Had Alicea known that intubation was required, she would not have consented to the surgery. During the surgery, Dr. Catalano found that much of Stephenson's right lung was necrotic (dead tissue), and he removed two-thirds of the lung. Stephenson was extubated in the recovery room, and Alicea was not told that she had been intubated and put on a ventilator.

Two days later, on March 7, Stephenson was experiencing respiratory distress in the early morning hours, and the nursing staff was concerned that she would progress to respiratory failure. Around 4:00 a.m., the nursing staff called Dr. Catalano at home. Dr. Catalano decided to have Stephenson intubated and put on a ventilator to prevent her from going into respiratory or cardiac arrest. A nurse asked Dr. Catalano if he wanted to call Alicea before ordering the life-prolonging intubation, but he rebuffed her, saying, "I'm not going to call her at six o'clock in the morning and scare the hell out of her. I'll wait till, you know, she wakes up and then I'm going to call her and tell her what happened." Dr. Catalano then spoke to the on-duty doctor and directed him to intubate Stephenson, telling the doctor, "I don't want her to die."[3] The on-duty doctor

---

[3] In his deposition, Dr. Catalano explained his thought process at the time as follows:

I'm thinking, well, I mean what's the worst. If the family does not want her on the

arrived at Stephenson's bedside at 4:50 a.m., performed the intubation, and hooked Stephenson up to a ventilator. No effort was made to contact Alicea before or after Stephenson was intubated.

When Alicea's husband stopped by the Hospital that morning around 8:00 a.m. to check on Stephenson, he was surprised to see her on a ventilator. He called Alicea, who was shocked by the news, and told her that the nursing staff could not find the Advance Directive. Alicea left work as quickly as she could, got a copy of the Advance Directive from home, and headed to the Hospital. It took the nursing staff 15 to 20 minutes of searching to locate the Hospital's copy of the Advance Directive, and one nurse remarked to Alicea's husband, "Boy, somebody has really messed up. I found it."

When Alicea got to the Hospital, she demanded to know from the ICU nurses why her direction not to intubate Stephenson without calling her first had

---

respirator, well, we can just pull the tube out. And, you know, we've wasted an hour or two of her staying in the hospital ICU but, on the other hand, if we try to make calls she'd be dead. I mean I can't call the family . . . . I said, well, let's just do what's right for the patient. My God, we can always undo it. But . . . if the patient dies, you know, that's my ultimate loss. There's no way I can get her back. So when this happened I really didn't go into any of the code/no code/do not intubate/resuscitate. Save the patient's life first and then we'll do whatever it takes to make the family and that patient whatever, but we can't undo death. So that's what I was thinking.

been disregarded. Alicea was very upset, and the nursing staff asked Dr. Mehrdad (Michael) Behnia, the physician in charge of the ICU, to explain what had happened that morning. Alicea held up the Advance Directive and told the doctor that her grandmother had expressed her wishes, which were contrary to what had happened, and that Alicea had specifically said to call her before putting Stephenson on a ventilator. Later that morning, Dr. Catalano wrote in a progress note that Stephenson was "beginning to go into respiratory failure" at about 4:00 a.m. and that she was "'exigently intubated' before emergency" at his request.

Alicea asked Dr. Behnia about possible next steps. He told her that she could decide to have Stephenson taken off the ventilator and extubated, which would cause her grandmother to suffocate and die (as had happened with Alicea's father), and that the only other option was to perform another surgery to clean out Stephenson's lung cavity more. Had Stephenson been allowed to die that morning, Alicea "would have understood that it was her time and God took her." Having been deprived of the opportunity to let nature take its course, Alicea consented to the surgical procedure and others recommended by Dr. Catalano and the Hospital staff over the next week, including the placement of

10

a feeding tube, a bronchoscopy to remove pus from Stephenson's airway, and a tracheostomy to provide an alternate airway and to remove secretions.

On March 14, Alicea was informed that Stephenson's kidneys were shutting down and that she needed dialysis, and Alicea gathered the family at the Hospital to discuss the situation. Dr. Behnia talked to them and recommended that they take Stephenson off the ventilator. He said that she could be moved out of the ICU and given comfort measures such as morphine until she passed away. Alicea then authorized the removal of the ventilator and the provision of comfort measures only, and three days later, on March 17, 2012, Stephenson died.

(c) On May 14, 2013, Alicea, acting as the administratrix of Stephenson's estate, filed a complaint against the Hospital and Dr. Catalano, raising claims of breach of agreement, professional and ordinary negligence, medical battery, intentional infliction of emotional distress, and breach of fiduciary duty. The Hospital's alleged liability was based on respondeat superior for the actions of its agents and employees. The complaint alleged that Dr. Catalano and other medical personnel associated with the Hospital had subjected the terminally ill Stephenson to unnecessary medical procedures, in

11

particular her intubation and placement on a ventilator on March 5 and 7, 2012, in violation of her Advance Directive and the directions of Alicea as her designated health care agent.

In support of her claims, Alicea relied on an expert on gerontology, geriatrics, and palliative care.[4] The expert concluded that when Stephenson arrived at the Hospital on March 4, she already "had an incurable and irreversible condition that was likely to result in her death within a relatively short period of time thereafter," and that "her condition was such that the likely risk and burdens of any invasive procedures and treatment outweighed any expected benefits." Consequently, the expert opined that the Defendants were required under the standard of care to refrain from taking steps to prolong her life in accordance with her Advance Directive as well as the instructions of Alicea, her designated health care agent. According to Alicea's expert, Dr. Catalano breached the standard of care by, among other things, failing to review

---

[4] The Defendants assert that Alicea's expert was not qualified to provide expert testimony under OCGA § 24-7-702. But they raised this issue in a motion to strike the expert's affidavits and opinions filed after the trial court entered its summary judgment order, and the trial court has not yet ruled on that motion. Like the Court of Appeals, we therefore proceed on the assumption that Alicea's expert is qualified. See Alicea, 332 Ga. App. at 535 n.5. See also Toyo Tire N. Am. Mfg., Inc. v. Davis, Case No. S15G1804, slip op. at 9-12 (decided June 6, 2016).

12

Stephenson's Advance Directive and the progress notes in her medical chart to determine if Alicea had given any directions for Stephenson's care and by failing to obtain basic consent from Alicea before the March 7 intubation. The expert further opined that the nurses employed by the Hospital had violated the standard of care by failing to contact Alicea before the March 7 intubation and failing to call Dr. Catalano's attention to Stephenson's Advance Directive and the notation in the progress notes regarding intubation.

Following discovery, the Defendants filed a motion for summary judgment, contending among other things that they were immune from liability based on the March 7 surgical procedure under OCGA § 31-32-10 (a) (2) and (3).[5] On May 20, 2014, the trial court denied summary judgment on that issue, but granted the Defendants a certificate of immediate review.[6]

The Court of Appeals granted the Defendants' application for

---

[5] The Defendants did not argue in the trial court that they were entitled to immunity for the March 5 surgical procedure, so like the Court of Appeals, we will not consider that issue. See Alicea, 332 Ga. App. at 539 n.10.

[6] The trial court granted summary judgment to the Defendants on whether intubation is a medical procedure covered by Georgia's informed consent statute, OCGA § 31-9-6.1, holding as a matter of law that it is not; Alicea did not appeal that ruling. Alicea's complaint also named as defendants the doctor who intubated Stephenson at Dr. Catalano's direction on March 7 and his employer, but Alicea did not appeal the trial court's separate order granting them summary judgment.

interlocutory appeal and affirmed in relevant part. In Division 1 of its opinion, the Court of Appeals held that the Defendants were not entitled to summary judgment that they had immunity under § 31-32-10 (a) (2) and (3) for the failure to comply with Alicea's direction to contact her and obtain permission before intubating Stephenson and placing her on a ventilator on March 7, 2012. The court found that genuine issues of material fact exist as to whether Dr. Catalano and the Hospital's nurses "made a good faith effort to rely on" Alicea's directions and decisions as Stephenson's health care agent. Alicea, 332 Ga. App. at 541-542. We granted certiorari to review this portion of the Court of Appeals' decision.[7]

2.     The Defendants argue that the Court of Appeals misconstrued the Advance Directive Act as requiring health care providers to act in "good faith

---

[7] In Division 2 of its opinion, the Court of Appeals reversed the trial court's denial of summary judgment to the Defendants on Alicea's medical malpractice claim premised on lack of informed consent to the March 5 surgery, on the ground that there was no evidence in the record that the March 5 surgery proximately caused any injury to Stephenson. See Alicea, 332 Ga. App. at 543-544. In Division 3, the Court of Appeals addressed the denial of summary judgment to the Defendants on Alicea's claims for medical battery premised on lack of basic consent (as opposed to informed consent) for both the March 5 surgery and the March 7 intubation, reversing the trial court as to the March 5 surgery but affirming as to the March 7 intubation. See id. at 544-545. Alicea did not seek review by certiorari of the portions of the Court of Appeals' decision adverse to her, and our order granting the Defendants' petition for certiorari did not ask the parties to address the medical battery claim based on the March 7 intubation. We express no opinion on any of those issues.

14

reliance" on the designated health care agent's directions and decisions in order to qualify for the immunity from civil liability provided in OCGA § 31-32-10 (a) (2) and (3). Our rejection of this argument depends in part on our understanding of the Act's overall purpose and operation, so we will outline those features before turning to a detailed examination of § 31-32-10 (a).

(a)     In 2007, the General Assembly enacted the statute that contains the Advanced Directive Act to replace two prior legislative schemes concerning end-of-life care, seeking to update the law in this area and eliminate inconsistencies and confusion. See Ga. L. 2007, p. 133, § 1 (b); former OCGA §§ 31-32-1 to 31-32-12 ("Living Will Act"); former OCGA §§ 31-36-1 to 31-36-13 ("Durable Power of Attorney for Health Care Act"). As the uncodified first section of the 2007 statute explained:

> The General Assembly has long recognized the right of the individual to control all aspects of his or her personal care and medical treatment, including the right to insist upon medical treatment, decline medical treatment, or direct that medical treatment be withdrawn.

Ga. L. 2007, p. 133, § 1 (a). Thus,

> the clear expression of an individual's decisions regarding health care, whether made by the individual or an agent appointed by the individual, is of critical importance not only to citizens but also to

15

the health care and legal communities, third parties, and families.

Id. § 1 (d). The Advance Directive Act sets forth "general principles governing the expression of decisions regarding health care and the appointment of a health care agent, as well as a form of advance directive for health care." Id. The statutory advance directive form is found in OCGA § 31-32-4. Thus, a clear objective of the Act is to ensure that in making decisions about a patient's health care, it is the will of the patient or her designated agent, and not the will of the health care provider, that controls.

(b) OCGA § 31-32-2 defines terms that are used in the Advance Directive Act. The Act authorizes an individual – whom the Act calls the "declarant" and we will also call the "patient" (Stephenson in this case) – to voluntarily execute a written document called an "[a]dvance directive for health care," appointing a "health care agent" to "act for and on behalf of the declarant to make decisions related to consent, refusal, or withdrawal of any type of health care . . . when a declarant is unable or chooses not to make health care decisions for himself or herself." OCGA § 31-32-2 (1), (3), (6). See also OCGA § 31-32-5 (setting forth the formalities for executing and amending a valid advance

directive for health care).[8]

The Act defines "health care" broadly to mean "any care, treatment, service, or procedure to maintain, diagnose, treat, or provide for a declarant's physical or mental health or personal care." OCGA § 31-32-2 (5). Several subcategories of health care are also defined, including "provision of nourishment or hydration," which refers to "the provision of nutrition or fluids by tube or other medical means," OCGA § 31-32-2 (12); and "life-sustaining procedures," which means "medications, machines, or other medical procedures or interventions" without which death will occur in the judgment of the patient's attending physician and another doctor and which could, in reasonable medical judgment, keep a patient who is in a terminal condition or state of permanent unconsciousness alive but cannot cure her, OCGA § 31-32-2 (9). See also OCGA § 31-32-2 (14) (defining a "terminal condition" as "an incurable or irreversible condition which would result in the declarant's death in a relatively

---

[8] Although the Advance Directive that Stephenson executed in 2009 was not done in the form set out in OCGA § 31-32-4, it is undisputed that the directive substantially complied with the statutory requirements for a valid advance directive. See OCGA §§ 31-32-4 ("Using this form of advance directive for health care is completely optional. Other forms of advance directives for health care may be used in Georgia."), 31-32-5 (b) ("No provision of this chapter shall be construed to bar a declarant from using any other form of advance directive for health care which complies with this Code section.").

17

short period of time"), (13) (defining a "state of permanent unconsciousness").[9]

A patient's "health care providers" include her "attending physician" – the doctor with primary responsibility for her treatment and care – and "any other person administering health care," as well as "any person employed by or acting for" them. OCGA § 31-32-2 (2), (8). So Dr. Catalano and the Hospital's staff were among Stephenson's health care providers; the Hospital itself was a "health care facility." See OCGA § 31-32-2 (9).

It is the responsibility of the patient or the health care agent to notify the health care provider of the existence of the advance directive and any amendment to or revocation of the directive. See OCGA § 31-32-8 (1). A provider furnished with a copy of an advance directive is required to "make such copy a part of the [patient's] medical records and shall enter in the records any change in or termination of the advance directive . . . that becomes known to the

---

[9] The Act also describes two additional subcategories of health care. OCGA § 31-32-2 (9) specifically excludes from "life-sustaining procedures" what might be called palliative care – "the administration of medication to alleviate pain or the performance of any medical procedure deemed necessary to alleviate pain." See also OCGA § 31-32-8 (2) (qualifying the general rule that a health care provider must comply with a health care agent's directions and decisions in light of "the health care provider's right to administer treatment for the [patient's] comfort or alleviation of pain"). And OCGA § 31-32-7 (e) (1) excludes "psychosurgery, sterilization, or involuntary hospitalization or treatment" from the types of health care that a health care agent may consent to, withhold or withdraw consent to, and authorize or refuse for the patient.

18

health care provider." Id. See also OCGA § 31-32-6 (a) (3) and (4) (requiring the patient's attending physician to record in the patient's medical record the time and date of any written or properly verified oral revocation of an advance directive).

The Act then sets forth several rules for how decisions are to be made in caring for a patient with an advance directive. If the patient's attending physician determines in good faith that the patient is able to understand the general nature of the health care procedure being consented to or refused, the patient's own decision about that procedure prevails over contrary instructions by a health care agent. See OCGA § 31-32-7 (a). However,

> [w]henever a health care provider believes a declarant is unable to understand the general nature of the health care procedure which the provider deems necessary, the health care provider shall consult with any available health care agent known to the health care provider who then has power to act for the declarant under an advance directive for health care.

OCGA § 31-32-8 (1). In addition, with respect to the withholding or withdrawal of life-sustaining procedures or nourishment and hydration, the health care agent's directions prevail over the patient's written instructions in the advance directive, unless the advance directive specifies otherwise. See OCGA § 31-32-

19

14 (d).  The health care agent also has priority over any other person, including a guardian, to act for the patient in matters covered by the advance directive, unless the directive says otherwise.  See OCGA § 31-32-14 (e).

The health care decision now at issue in this case is the decision that needed to be made on March 7, 2012, about whether Stephenson should be intubated and put on a ventilator to prolong her life.  Stephenson was unable to, and clearly did not, make that decision for herself, so Alicea had the authority to make that decision for Stephenson under her Advance Directive, which Alicea had given to the Hospital's staff and had discussed with them and with Dr. Catalano.  With respect to the duties of "[e]ach health care provider and each other person with whom a health care agent interacts under an advance directive for health care" in this situation, the Act says the following in OCGA § 31-32-8 (2):

> A health care decision made by a health care agent in accordance with the terms of an advance directive for health care shall be complied with by every health care provider to whom the decision is communicated, subject to the health care provider's right to administer treatment for the [patient's] comfort or alleviation of pain; provided, however, that if the health care provider is unwilling to comply with the health care agent's decision, the health care provider shall promptly inform the health care agent who shall then be responsible for arranging for the [patient's] transfer to another

20

health care provider. A health care provider who is unwilling to comply with the health care agent's decision shall provide reasonably necessary consultation and care in connection with the pending transfer.

Thus, a health care provider in this situation generally must comply with the health care agent's decision, with two exceptions. The first, not pertinent here, is as to pain treatment. The second recognizes that the provider may be "unwilling" to comply with the agent's decision, on medical, moral, or other grounds. But the unwilling provider is not entitled to then make the health care decision for the patient himself, or to just walk away. The Act requires such a provider to "promptly inform" the agent of his unwillingness to comply and also to "provide reasonably necessary consultation and care" in connection with the transfer of the patient to another care-giver as arranged by the agent – presumably a transfer to a provider (who may be in the same facility) who will comply with the agent's decision.

(c)     The Advance Directive Act then includes a series of immunity provisions in OCGA § 31-32-10. The Defendants seek to rely on § 31-32-10 (a), and in particular on subsections (a) (2) and (3).[10]

_____

[10] Subsections (b) and (c) of OCGA § 31-32-10 relate to immunity from civil and criminal liability and professional discipline involving the patient's instructions concerning the withholding

OCGA § 31-32-10 (a) begins with a general release of liability for

> [e]ach health care provider, health care facility, and any other person who acts in good faith reliance on any direction or decision by the health care agent . . . to the same extent as though such person had interacted directly with the declarant as a fully competent person.

The Act then says:

> Without limiting the generality of the foregoing, the following specific provisions shall also govern, protect, and validate the acts of the health care agent and each such health care provider, health care facility, and any other person acting in good faith reliance on such direction or decision:  . . . .

After the colon come five specific immunity provisions.  See OCGA § 31-32-10 (a) (1)-(5).[11]

---

or withdrawal of life-sustaining procedures, nourishment, or hydration as discussed in § 31-32-9. Subsection (d) addresses the immunity of witnesses to an advance directive, and subsection (e) specifies that immunity is not available under the Act to any person who participates in the withholding or withdrawal of life-sustaining procedures, nourishment, or hydration with actual knowledge that an advance directive has been properly revoked.

[11] In full, the specific immunity provisions say:

(1)　　No such health care provider, health care facility, or person shall be subject to civil or criminal liability or discipline for unprofessional conduct solely for complying with any direction or decision by the health care agent, even if death or injury to the declarant ensues;

(2)　　No such health care provider, health care facility, or person shall be subject to civil or criminal liability or discipline for unprofessional conduct solely for failure to comply with any direction or decision by the health care agent, as long as such health care provider, health care facility, or person promptly informs the health care agent of such health care provider's, health care facility's, or person's refusal or failure to comply with such direction or

22

The first three of these statutory immunity provisions, it is important to recognize, mirror the statutory duties imposed on health care providers by OCGA § 31-32-8 (2). Corresponding to the first clause of § 31-32-8 (2), which requires that "[a] health care decision made by a health care agent in accordance with the terms of an advance directive for health care shall be complied with by every health care provider to whom the decision is communicated," § 31-32-10 (a) (1) grants providers immunity from civil or criminal liability or professional discipline "solely for complying with any direction or decision by the health

decision by the health care agent. The health care agent shall then be responsible for arranging the declarant's transfer to another health care provider. A health care provider who is unwilling to comply with the health care agent's decision shall continue to provide reasonably necessary consultation and care in connection with the pending transfer;

(3)  If the actions of a health care provider, health care facility, or person who fails to comply with any direction or decision by the health care agent are substantially in accord with reasonable medical standards at the time of reference and the provider cooperates in the transfer of the declarant pursuant to paragraph (2) of Code Section 31-32-8, the health care provider, health care facility, or person shall not be subject to civil or criminal liability or discipline for unprofessional conduct for failure to comply with the advance directive for health care;

(4)  No health care agent who, in good faith, acts with due care for the benefit of the declarant and in accordance with the terms of an advance directive for health care, or who fails to act, shall be subject to civil or criminal liability for such action or inaction; and

(5)  If the authority granted by an advance directive for health care is revoked under Code Section 31-32-6, a person shall not be subject to criminal prosecution or civil liability for acting in good faith reliance upon such advance directive for health care unless such person had actual knowledge of the revocation.

23

care agent, even if death or injury to the declarant ensues." And corresponding to the proviso in § 31-32-8 (2) for health care providers who are "unwilling to comply with the health care agent's decision," § 31-32-10 (a) (2) and (3) give such providers similarly broad immunity – so long as they promptly inform the agent of the "refusal or failure" to comply with the agent's direction or decision and assist with the patient's continued care to the extent of continuing to provide reasonably necessary consultation and care in connection with a pending transfer of the patient, acting substantially in accord with reasonable medical standards, and cooperating in any transfer of the patient as authorized by § 31-32-8 (2).[12]

The Defendants contend that subsections (a) (2) and (3) provide freestanding immunity, not limited by the requirement set forth in the clause that

---

[12] We note that "failure," "fails," "refusal," and "unwilling" are used interchangeably in subsections (a) (2) and (3) with regard to a lack of compliance with the agent's direction; § 31-32-8 (2), to which subsection (a) (3) expressly refers and which describes the course of provider conduct authorized by the Act that is then immunized by subsections (a) (2) and (3), uses "unwilling to comply." And the Act elsewhere refers to "fail[ure]" and "refus[al]" together as "unwilling[ness]." See OCGA § 31-32-9 (d) ("The attending physician who *fails* or *refuses* to comply with the [patient's] directions regarding the withholding or withdrawal of life-sustaining procedures or the withholding or withdrawal of the provision of nourishment or hydration shall advise promptly the health care agent . . . that such physician is *unwilling* to effectuate such directions." (emphasis added)). Thus, as used in these provisions, all these terms have the connotation of an intentional rather than merely negligent lack of compliance.

24

precedes the subsections, that the provider must have been "acting in good faith reliance on such direction or decision [by the health care agent]." The Defendants assert that the General Assembly intended to broadly immunize health care providers for "failure to comply" with the directives of health care agents.

The Court of Appeals rejected this reading of the statute, and so do we. To begin with, as a matter of basic grammar, the text following a colon normally elaborates on the general statement that comes before it, rather than being disassociated from the introductory clause. See William Strunk, Jr. & E.B. White, The Elements of Style (3d ed. 1979) ("A colon tells the reader that what follows is closely related to the preceding clause."). Moreover, as the Court of Appeals observed, subsection (a) (2) begins with the words "[n]o *such* health care provider," providing an explicit textual link between subsection (a) (2) and the providers described in the introductory clause – that is, providers "acting in good faith reliance on such direction or decision [by the health care agent]." See Alicea, 332 Ga. App. at 541. Subsection (a) (1) also starts with "[n]o *such* health care provider." Subsection (a) (3) has a different opening, but as explained previously, (a) (3) supplements (a) (2) in reflecting the duties imposed

25

on providers who are "unwilling to comply" with an agent's direction pursuant to the proviso in § 31-32-8 (2) – just as (a) (1) mirrors the general compliance duty in § 31-32-8 (2) – so a separate link to the introductory clause was not needed. Indeed, to reiterate that only health care providers who act in good faith reliance on the agent's directions are entitled to immunity under § 31-32-10 (a), the introductory clause speaks of "each *such* health care provider . . . acting in good faith reliance on such direction or decision" – the "such" referring back to the providers discussed in the preceding general-release sentence, that is, "[e]ach health care provider who acts in good faith reliance on any direction or decision by the health care agent."

> Thus, we agree with the Court of Appeals that,

> [t]aken together, the language, grammar, and structure of OCGA § 31-32-10 (a) reflect that the requirement of "good faith reliance" on a health care agent's direction or decision referenced in the introductory clause was intended to apply to the subsections that follow it, including subsections (a) (2) and (3) pertaining to a failure to comply with an agent's direction or decision.

Alicea, 332 Ga. App. at 541. We also agree with the Court of Appeals that "good faith" as used in this context means "'a state of mind indicating honesty and lawfulness of purpose [and a] belief that one's conduct is not

26

unconscionable or that known circumstances do not require further investigation.'"  Id. (quoting O'Heron v. Blaney, 276 Ga. 871, 873 (583 SE2d 834) (2003), and citing Anderson v. Little & Davenport Funeral Home, 242 Ga. 751, 753 (251 SE2d 250) (1978)).

The Court of Appeals did not discuss, however, what "reliance" means in this context, turning instead to an analysis of whether the evidence indicates that Dr. Catalano honestly believed that he was complying with Alicea's directions when he ordered Stephenson's intubation on March 7.  Alicea, 332 Ga. App. at 541-542.  This approach skips over the preliminary question of reliance.  OCGA § 31-32-8 (2) plainly authorizes a health care provider to make *no* effort to comply with an agent's direction – to refuse or fail entirely to comply – so long as the provider promptly informs the agent of that choice and takes the other steps of care and cooperation that the Act requires.  And OCGA § 31-32-10 (a) (2) and (3) give such a provider immunity for doing just what the statute allows him to do.  What is critical, in our view, is that a provider claiming to have acted in "good faith reliance" on the agent's direction or decision can show that he acted in *dependence* on that direction or decision, not without reference to the agent's wishes.  See Black's Law Dictionary 1293 (7th ed. 1999) (defining

27

"reliance" as "[d]ependence or trust by a person, esp. when combined with action based on that dependence or trust"); Webster's Third New International Dictionary 1917 (1966) (defining "reliance" as "the condition or attitude of one who relies," listing "dependence" as a synonym of this sense of the word).

Recall that a primary purpose of the Advance Directive Act is to ensure that in making decisions about a patient's health care, it is the will of the patient or her designated agent, rather than the will of the health care provider, that controls. OCGA § 31-32-8 (1) enforces this purpose by declaring that a health care provider who

> believes a declarant is unable to understand the general nature of the health care procedure which the provider deems necessary . . . shall consult with any available health care agent known to the health care provider who then has power to act for the declarant under an advance directive for health care.

If a provider is aware of what the agent has decided, and then proceeds as the statute mandates in § 31-32-8 (2) – either by complying with that decision or by taking the steps required when he is unwilling to comply with the decision – then he may look to the immunity provisions in § 31-32-10 (a) for protection. But a provider cannot claim this immunity when his action was not based in good faith on the agent's direction, just because the decision he made for the

28

patient happens to be one that arguably complied or failed to comply with what the agent would have decided.  Put another way, when the health care provider makes the patient's health care decisions on his own, without relying in good faith on what the patient's agent directed, the provider must defend his actions without the immunity given in OCGA § 31-32-10 (a).

3.  When we apply these legal principles to the current record in this case, construed in favor of Alicea as the non-moving party, it is clear that the Defendants were properly denied summary judgment on their immunity claim based on OCGA § 31-32-10 (a) (2) and (3).  The health care decision in question is the decision to intubate Stephenson and put her on a ventilator as a life-prolonging measure around 4:00 a.m on the morning of March 7, 2012. Although there is evidence to the contrary, there is ample evidence that in ordering that procedure, Dr. Catalano was not acting in good faith reliance – in honest dependence – on any decision Alicea had made as Stephenson's health care agent, either to comply with it or to refuse or fail to comply with it and then promptly inform Alicea of his unwillingness.  Instead, the evidence would support a finding that Dr. Catalano made the health care decision himself, in the exercise of his own medical and personal judgment.  By his own account, when

he directed the on-duty doctor to intubate Stephenson, he was not considering the stuff of advance directives and health care agents – "any of the code/no code/do not intubate/resuscitate"; he decided himself "what's right for the patient," and would check with Alicea later to see if she wanted to "undo" the procedure he was ordering and "pull the tube out." See footnote 3 above. Dr. Catalano even rebuffed a nurse's question about calling Alicea before ordering the intubation, saying that he would call her later "and tell her what happened."

As discussed above, the Advance Directive Act is all about letting patients and their health care agents, rather than the health care provider, control such decisions. Also reflected in many provisions of the Act is a principle that Dr. Catalano apparently disagreed with – that the patient and her agent may see a real difference between passively allowing her life to slip away and requiring a loved one to make the affirmative decision to "pull the plug" and halt life-sustaining measures like mechanical ventilation so that the patient dies. The record indicates that had Alicea been consulted before the intubation as she had directed, she would not have authorized the procedure.

Because there is at least a disputed issue of fact as to whether Dr. Catalano acted with good faith reliance on any decision made by his patient's health care

30

agent, Dr. Catalano cannot on motion for summary judgment claim the immunity that subsections (a) (1), (2), and (3) give to providers who honestly depend on such a decision to either comply with it or promptly inform the patient that they are unwilling to comply with it. Likewise, the Hospital points to no evidence that its staff acted based on a decision by Alicea with respect to the March 7 intubation; when Dr. Catalano made the decision himself, the staff simply proceeded based on his directive.

There is also another straightforward ground for rejecting immunity under subsections (a) (2) and (3). As explained above, those provisions immunize providers who are unwilling to comply with a health care agent's directive, promptly inform the agent of that unwillingness, and take other steps regarding the patient's care until a transfer can be effectuated. There is no evidence that Dr. Catalano and the Hospital staff were *unwilling* to comply with Alicea's direction regarding intubating Stephenson, much less that they promptly communicated any such unwillingness to Alicea. If anything, the Defendants claim that they believed they were *complying* with Alicea's directive, which would invoke immunity under subsection (a) (1).

We therefore need not decide the closer question on which the Court of

31

Appeals based its decision (and on which the parties focus their arguments) – whether there is a sufficient factual dispute about Dr. Catalano's understanding of Alicea's wishes about intubation to show that he was not acting in "good faith." The evidence of Dr. Catalano's actions and inactions to which the Court of Appeals pointed may well support its ruling on that point. See Alicea, 332 Ga. App. at 542. But given the clear factual dispute about whether he relied at all on any directive from Alicea in acting to order the March 7 intubation, as well as the apparently undisputed evidence that he did not satisfy the "unwilling to comply" and "promptly inform" requirements for immunity under subsections (a) (2) and (3), we need not rest our ruling on this point. We of course render no opinion regarding how the record may develop as this case progresses or how a jury would ultimately decide the disputed factual issues at trial, or on the other legal issues in this case, including whether any actions taken by the Defendants without reliance on Alicea's directions may subject them to liability.

For the reasons discussed above, the trial court correctly denied the Defendants' motion for summary judgment as to their claim of immunity from civil liability under OCGA § 31-32-10 (a) (2) and (3), and the Court of Appeals correctly affirmed that ruling.

Judgment affirmed. All the Justices concur.

32