**THIRD DIVISION**
**MILLER, P. J.,**
**MCFADDEN, P. J., and MCMILLIAN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**March 14, 2017**

# In the Court of Appeals of Georgia

A16A1709. EVERSON et al. v. PHOEBE SUMTER MEDICAL
    CENTER, INC. f/k/a SUMTER REGIONAL HOSPITAL,
    INC. et al.

A16A1710. JORDAN v. EVERSON et al.

MCFADDEN, Presiding Judge.

These related appeals arise from the tragic death of 27-year-old Benjamin Everson. On April 29, 2008, Everson went to Sumter Regional Hospital, Inc., now known as Phoebe Sumter Medical Center, Inc. ("the hospital"), complaining that he was hallucinating and hearing voices. Dr. Brian Jordan, the emergency room physician who attended to Everson, diagnosed him with Obsessive Compulsive Disorder and discharged him with an appointment to see a mental health care provider two days later at a nearby facility. Instead, Everson's father made an appointment for him with a different facility out of state. On May 1, 2008, en route to that

appointment, Everson leapt from a moving car driven by his father and ran in front of another vehicle, which struck and killed him.

Everson's parents, on behalf of themselves, and Everson's estate (collectively, "the plaintiffs") brought this wrongful death action alleging medical malpractice claims against the hospital and Jordan. The trial court granted summary judgment to the hospital and denied summary judgment to Jordan.

In Case No. A16A1709, the plaintiffs appeal from the trial court's order granting summary judgment to the hospital. The plaintiffs argue that the trial court erred in denying their motion to strike the hospital's answer and enter a default judgment against it as a sanction for alleged discovery abuses, but the trial court was authorized to find that the sanction was not appropriate because the hospital did not intentionally falsify its discovery response. The plaintiffs argue that the trial court erred in excluding the opinion testimony of an expert witness, but the trial court did not abuse his discretion in concluding that the expert's opinion did not satisfy the admissibility requirements of OCGA § 24-7-702 (b). Finally, the plaintiffs argue that the trial court should not have granted summary judgment on their claims for ordinary negligence, but the trial court ruled that the statute of limitation and statute of repose barred those claims, and the plaintiffs offer no argument or citation to authority to

show that the trial court erred in that ruling. Accordingly, we affirm the judgment in Case No. A16A1709.

In Case No. A16A1710, Jordan appeals from the denial of his motion for summary judgment. We find that genuine issues of material fact preclude summary judgment and, accordingly, we affirm the denial of summary judgment to Jordan.

1. *Facts and procedural history.*

We review a ruling on a summary judgment motion de novo, "constru[ing] the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences." *Doctors Hosp. of Augusta, LLC v. Alicea*, 299 Ga. 315 (1) (788 SE2d 392) (2016) (citation omitted). Consequently, we construe the evidence in both of these cases in the light most favorable towards the plaintiffs.

So viewed, the evidence showed that in late April 2008, Everson, a law school graduate who had been working as a judicial law clerk in Americus, was preparing to move back to his home state of Connecticut, and his mother had arrived to help him. For some time, Everson had been under a physician's care for depression and anxiety, for which he sometimes took medication. In the two weeks preceding his death, Everson had begun hallucinating and hearing voices. For several nights in a

3

row, Everson woke his mother in the middle of the night and spoke to her in a rambling, accelerated manner. On the third such occasion, in the early morning of April 29, 2008, Everson's mother called Everson's father, a medical doctor, and put Everson on the telephone. Everson's father was concerned about the way his son sounded and suggested to Everson's mother that he get a psychiatric evaluation. Everson's father contacted the hospital and spoke with a person he understood to be the hospital's on-call psychiatrist, who recommended that Everson go to the hospital's emergency room to be evaluated. Everson's father also made plans to travel to Georgia.

Consequently, on April 29, 2008, Everson and his mother went to the hospital's emergency room. There, Everson told a hospital triage nurse that he had been hearing voices and experiencing hallucinations and that his head felt "heavy," and the nurse noted much of this information on a triage form. A different emergency room nurse interviewed Everson and made notes in his medical chart about his complaints.

Everson and his mother saw Jordan, a physician who was staffing the emergency room that day as an independent contractor, not a hospital employee. Jordan reviewed the triage form, spoke with Everson, and examined him. Everson appeared somewhat anxious to Jordan, with accelerated, rambling speech, and he had

4

an elevated pulse and blood pressure. Jordan noted Everson's chief complaint to be hallucinating. Everson told Jordan that he was hearing his own voice "rambling inside his head," which confused him, and that his symptoms had begun two weeks earlier. Jordan described Everson as fixated on having racing thoughts about himself.

Jordan discharged Everson from the hospital with a diagnosis of Obsessive Compulsive Disorder; he also underlined "psychosis" on Everson's paperwork. At the request of Everson's mother, Jordan had another emergency room nurse schedule an appointment for Everson with Middle Flint Behavioral HealthCare ("Middle Flint"), a regional state-run mental health facility. The nurse scheduled that appointment for May 1, 2008, two days later.

Everson and his mother returned to Everson's apartment and his father arrived later that afternoon. His parents decided that, instead of taking Everson to Middle Flint for treatment, they would arrange to have Everson evaluated at a facility associated with Duke University, where one of Everson's brothers attended medical school and where Everson's father had professional connections.

On April 30, Everson and his father began the drive to Duke University, stopping overnight at a hotel near Atlanta and resuming their drive the next morning. While they were traveling on an interstate highway that morning, Everson began

fidgeting with the electronic door locks of the car. Then Everson's father, who was driving, noticed that Everson was not wearing his seat belt. Everson put his seat belt back on at his father's request but then, suddenly, he took the seat belt off, opened the car door, and leapt out of the moving car. Everson's father stopped the car and got out to attend to his son, who was lying on the ground, unconscious, next to the highway. Everson regained consciousness and the two men stood up. At that point, Everson appeared to his father to be in "a totally psychotic state." Everson began running down the side of the highway. He ran approximately half a mile, with his father chasing him. He then stepped into the path of a large vehicle, which struck him, killing him instantly.

The plaintiffs brought an action for medical malpractice against the hospital and Jordan, alleging that the defendants failed to properly evaluate and treat Everson's condition when he went to the emergency room, misdiagnosed him, and failed to recognize that he needed a psychiatric evaluation. In support of their action they provided affidavits from two expert witnesses — a psychiatrist and a physician certified in emergency medicine. These witnesses opined that Jordan and two of the hospital nurses had deviated from the applicable standard of care. On November 25,

2015, the plaintiffs filed an amended complaint adding new claims against the hospital, including claims of ordinary negligence.

Both the hospital and Jordan moved for summary judgment. The hospital also moved for the trial court to exclude the testimony of the plaintiffs' expert witnesses regarding the emergency room nurses. The plaintiffs moved for the trial court to strike the hospital's answer and enter a default judgment against it as a sanction for alleged discovery abuses by the hospital. In a series of orders, the trial court denied the plaintiffs' motion for the discovery sanction, granted the hospital's motion to exclude the experts' testimony as to the nurses, granted the hospital's motion for summary judgment, and denied Jordan's motion for summary judgment. The plaintiffs appealed from the rulings in the hospital's favor, and Jordan successfully sought interlocutory review of the ruling in the plaintiffs' favor. In addition to the parties' appellate briefs, the Georgia Trial Lawyers Association filed a brief as amicus curiae addressing specific issues relating to the trial court's discovery sanction and expert witness rulings.

*Case No. A16A1709.*

2. *Discovery sanction.*

7

The plaintiffs appeal from the trial court's denial of their motion to strike the hospital's answer and enter a default judgment against it for allegedly providing false and misleading responses to some of the plaintiffs' discovery requests. See generally OCGA § 9-11-37 (setting forth sanctions for discovery abuse). The crux of the parties' discovery dispute concerned the nature and extent of psychiatric services offered by the hospital following a 2007 tornado in which the hospital was severely damaged. In their argument on appeal, the plaintiffs focus on what they assert was the

> falsity and misleading nature of the hospital's discovery responses concerning: (1) the availability of "on call["] and/or on-staff psychiatrists and other mental health care providers to evaluate [Everson] at the hospital emergency room on the day in question; as well as (2) the very existence following the tornado of hospital policies and protocols relating to in-patient psychiatric evaluations performed on hospital [emergency room] patients by on-call psychiatrists and [mental health providers] from places such as Middle Flint.

After receiving evidence and argument on the alleged discovery abuses, the trial court found that the "only false discovery response concerned the issue of whether or not there were psychiatrists on staff which all evidence indicates was an unintentional and honest error which would not authorize the drastic sanctions being sought by [p]laintiffs." Consequently, the trial court denied the motion for sanctions.

8

"In determining whether a party has abused discovery, the trial court sits as trier of fact, and this [c]ourt will uphold [the trial court's] finding . . . if there is any evidence to support it." *Howard v. Alegria*, 321 Ga. App. 178 (1) (739 SE2d 95) (2013) (citation and punctuation omitted). As to the issue of psychiatrists on staff at the hospital, the hospital did not deny that its initial response was incorrect, and it argued that it corrected this response as soon as it realized the problem. The hospital presented evidence to the trial court that the initial, incorrect answer was not intentional. In an affidavit and in comments in open court, the hospital's counsel stated that he had erroneously believed that no psychiatrists remained on staff at the hospital after the hospital stopped providing in-patient psychiatric services, possibly because he had misunderstood information received from his client. The transcript of a deposition supported the statements made by the hospital's counsel — it showed that the hospital's counsel expressed surprise after the witness, a psychiatrist at Middle Flint, testified that she remained on staff at the hospital for a period of time after the tornado. And as to the issue of the hospital's policies and procedures, the record supports the trial court's finding that there was no actual misrepresentation.

The trial court's findings on these issues are "entitled to substantial deference on appeal. Unlike this [c]ourt . . . , the trial court directly supervised the ebb and flow

9

of the discovery and [proceedings] in this case and had the opportunity to observe and assess the conduct, demeanor, and credibility of the parties and their counsel throughout the proceedings[.]" *Ford Motor Co. v. Conley*, 294 Ga. 530, 547 (3) (a) (4) (757 SE2d 20) (2014) (citations omitted). Because the record supported the trial court's findings that the hospital did not intentionally provide incorrect discovery responses, the plaintiffs have not shown reversible error. See *Frady v. Irvin*, 245 Ga. 307, 308 (2) (264 SE2d 866) (1980) ("to reverse the . . . trial judge's denial of the appellants' motion [for discovery sanctions], this court would first have to hold that a finding of wilful failure to respond was demanded by the evidence as a matter of law"). Consequently, we need not address the arguments in the parties' briefs and the amicus brief concerning whether the plaintiffs were required to take action under OCGA § 9-11-37 or Ga. Unif. Super. Ct. R. 6.4 (B) before moving for sanctions.

3. *Expert opinion.*

In his order granting summary judgment to the hospital, the trial court barred the plaintiffs' two expert witnesses from giving opinion testimony on the standard of care applicable to the hospital's emergency room nurses on the ground that neither the experts nor their proposed testimony met the requirements of OCGA § 24-7-702 ("Rule 702"). On appeal, however, the plaintiffs offer argument as to only one of the

10

two experts, the physician certified in emergency medicine. That expert testified that the registered nurses deviated from the applicable standard of care by failing to question or challenge the attending physician's diagnosis of and treatment decisions regarding Everson. He testified that the nurses had a duty to determine that the attending physician's diagnosis was incorrect and to take any action necessary to prevent Everson from being discharged from the hospital, notwithstanding the attending physician's decision that he could be discharged.

"Rule 702 concerns the admissibility of opinion testimony by expert witnesses in civil cases. The usual standard for the admissibility of such testimony is found in Rule 702 (b)[.]" *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015) (footnote omitted). Rule 702 (b) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

11

OCGA § 24-7-702 (b). Contrary to the plaintiffs' assertion, the language in this statute "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U. S. 137, 147 (II) (A) (119 SCt 1167, 143 LE2d 238) (1999). See OCGA § 24-7-702 (f) (expressing legislative intent that courts of this state draw from *Kumho Tire Co. v. Carmichael*, supra, among other decisions, in interpreting and applying Rule 702). The premise of the statute "is that a trial court must act as a 'gatekeeper' to ensure the relevance and reliability of expert testimony." *Scapa Dryer Fabrics v. Knight*, 299 Ga. 286, 289 (788 SE2d 421) (2016) (citations and punctuation omitted) (addressing former OCGA § 24-9-67.1, the predecessor to OCGA § 24-7-702). We review the trial court's decision for abuse of discretion. See *Scapa Dryer Fabrics*, supra at 289-290.

We find no abuse of discretion. In excluding the testimony, the trial court stated "that the deviations from the standard of care alleged by the [p]laintiffs' physician expert[ ] pertain to conduct that is outside and beyond the scope of nursing care allowed by Georgia law." Compare OCGA § 43-34-21 (3) (defining the practice of medicine to include "the diagnosis or treatment of disease, defects, or injuries of human beings" and the "prescribing of any form of treatment") with OCGA § 43-26-3 (8) (defining the practice of nursing as a registered professional nurse to include

12

"[e]stablishing a nursing diagnosis," "[a]dministering, ordering, and dispensing . . . medical treatments authorized by protocol," and "[a]dministering medications and treatments as prescribed by a physician"). The failure of an expert's testimony to comport with applicable Georgia law is a ground for exclusion of that testimony under OCGA § 24-7-702 (b). See *Scapa Dryer Fabrics*, supra, 299 Ga. at 293-294. The expert testimony related to the nurses conflicts with the scope of the nursing profession as prescribed by Georgia law, so we find no abuse of discretion in the trial court's decision to exclude that testimony. In light of this conclusion, we do not address the question of the expert witness's qualifications under OCGA § 24-7-702 (c), which the parties and the amicus also address in their appellate briefs.

4. *Claims for ordinary negligence.*

In the summary judgment order, the trial court held that "the only claims filed by the [p]laintiffs against [the hospital] within the statute of limitation[ ] and/or statute of repose are [p]laintiffs' claims alleging professional negligence against [two specific nurses who were hospital] employees." Having excluded the plaintiffs' expert witness testimony on the issue of the standard of care applicable to these nurses, the trial court granted summary judgment to the hospital on those claims.

13

The plaintiffs argue that this was error because they also asserted claims for ordinary negligence. The claims to which the plaintiffs refer in this enumeration of error appear to be those asserted in the amended complaint, which the trial court held were barred by the statutes of limitation and repose. The plaintiffs, however, have offered no argument or citation to authority showing that the trial court erred in his application of the statute of limitation or statute of repose to bar those claims. And they have offered no argument or citation to authority showing that any other claims concerning the actions of the two named nurses were claims for ordinary rather than professional negligence. Consequently, the plaintiffs have not shown they are entitled to have the judgment reversed on this claim of error. See generally Ct. App. R. 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

*Case No. A16A1710.*

5. *Denial of summary judgment to Jordan.*

Jordan appeals from the trial court's denial of his motion for summary judgment. A defendant such as Jordan is entitled to summary judgment if the evidence shows "that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c). The essential

14

elements of a medical malpractice action are: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003) (citations and punctuation omitted). Jordan argues that there is no genuine issue of material fact either as to his breach of a duty to Everson or as to causation. We disagree.

(a) *Breach of a duty.*

Jordan argues that he was subject only to the "gross negligence" standard of care governing emergency medical care under OCGA § 51-1-29.5 (c), and he argues that there was no evidence that he breached that standard. But factual questions exist as to whether Jordan provided Everson with "emergency medical care," which the statute defines as

> bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a

15

nonemergency patient or care that is unrelated to the original medical emergency.

OCGA § 51-1-29.5 (a) (5).

The mere fact that the care was rendered in an emergency room is not dispositive; "the statute provides a definition of 'emergency medical care' that requires more than simply 'care provided in an emergency department.'" *Nguyen v. Southwestern Emergency Physicians, P. C.*, 298 Ga. 75, 79 (2) (a) (779 SE2d 334) (2015). The patient's actual medical or traumatic condition, as revealed by the patient's symptoms, determines whether his condition meets the requirements of the definition of "emergency medical care," id. at 80 (2) (c), and "the health care provider's subjective opinion about the patient's condition . . . is relevant as evidence of the patient's condition." Id. at 81 (2) (c) (citations omitted).

The evidence in this case, viewed in the light most favorable to the plaintiffs, creates a jury question about whether Everson's condition met the requirements of the definition of "emergency medical care." The triage nurse placed him in the "least critical" category of patients. The plaintiffs' expert witness opined that Everson's medical records showed he was medically stable when he presented to Jordan at the emergency room. And Jordan's act of discharging Everson with an appointment two

days later indicated that Jordan viewed Everson to be "capable of receiving medical treatment as a nonemergency patient[.]" OCGA § 51-1-29.5 (a) (5). Jordan argues that the plaintiffs' position that Everson's condition did not meet the requirements of the definition of "emergency medical care" is inconsistent with their position that he needed immediate psychiatric evaluation. This argument is one to be made at trial, not at summary judgment. See *Nguyen*, supra, 298 Ga. at 85 (3) n. 3 (noting, in reversing grant of summary judgment, that at trial plaintiffs will have the difficult task of arguing that patient's "symptoms were serious enough that the [medical p]roviders were negligent in failing to recognize the need for more tests and treatment — but not severe enough to require 'emergency medical care'").

Jury questions also exist as to whether Jordan breached the applicable standard of care in his treatment of Everson. The plaintiffs' expert witness, a psychiatrist, opined that Jordan deviated from the standard of care, among other ways, by failing to obtain a psychiatric consultation, by concluding that Everson suffered from Obsessive Compulsive Disorder, and by failing to request that an appropriate mental health professional come to the hospital to evaluate Everson's complaints of "confusion, hearing voices, and hallucinations."

17

For these reasons we are not persuaded by Jordan's argument that he is entitled to summary judgment because there is no genuine issue of material fact that he breached his duty of care to Everson.

(b) *Causation.*

A plaintiff in an action for medical malpractice "cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." *Zwiren*, supra, 276 Ga. at 500 (citations and punctuation omitted). Such a plaintiff also must prove that the defendant's negligence was the cause in fact of his injury. *Moore v. Singh*, 326 Ga. App. 805, 808-809 (1) (755 SE2d 319) (2014). Jordan argues that no genuine issue of material fact exists as to either aspect of causation. We disagree.

"Questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable[,] and undisputed cases." *Moore*, supra, 326 Ga. App. at 809 (1) (citation and punctuation omitted). This is not such a case. In affidavit and deposition testimony, the plaintiffs' expert witness opined that, to a reasonable degree of medical certainty or probability, Jordan's breaches of the standard of care proximately caused Everson's death and that, had Everson received proper evaluation and treatment, he

would be alive and mentally stable today. The expert witness, in his deposition, explained the basis for his opinion. His opinion satisfied the requirements for medical causation testimony articulated by our Supreme Court in *Zwiren v. Thompson*, supra, 276 Ga. at 501-502. See also *Wasdin v. Mager*, 274 Ga. App. 885, 889 (2) (619 SE2d 384) (2005) (expert witness's testimony, "much of which was couched in terms of reasonable medical probabilities and certainties," was sufficient evidence of causation to survive summary judgment). The expert witness's opinion also distinguishes this case from decisions cited by Jordan in which the plaintiffs offered expert testimony on causation that was speculative at best. See, e.g., *Miranda v. Fulton DeKalb Hosp. Auth.*, 284 Ga. App. 203, 207 (644 SE2d 164) (2007) (plaintiff's expert testified that, even if defendant hospital's employees had met standard of care, patient's suicide "could have been unpreventable"); *King v. Zakaria*, 280 Ga. App. 570, 577 (4) (b) (634 SE2d 444) (2006) (plaintiff's expert testified that it did not matter that defendant deviated from standard of care because patient's condition was unsalvageable); *Berrell v. Hamilton*, 260 Ga. App. 892, 896 (581 SE2d 398) (2003) (plaintiff's expert "admitted that he did not know whether earlier treatment [which plaintiff argued he would have obtained had defendant detected plaintiff's condition] would have made any difference"); *Ermutlu v. McCorkle*, 203 Ga. App. 335, 338 (2) (416 SE2d 792)

19

(1992) (plaintiffs' expert "could not state with any degree of medical certainty that [patient's] mental disorder [for which she allegedly had received improper care] caused the accident [that killed plaintiffs' daughter]").

Jordan argues that he is entitled to summary judgment because it was not reasonably foreseeable that Everson would harm himself. But the plaintiffs' expert witness testified that Everson displayed signs of psychosis when Jordan saw him in the emergency room, and that an acute onset of psychosis carries a risk of self-harm. Under some circumstances, a mentally-ill patient's suicide can be a reasonably foreseeable consequence of a medical provider's negligent conduct, even if the death occurs well after the negligent act. See *Purcell v. Breese*, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001); *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 116 (3) (b) (372 SE2d 265) (1988). It is for the jury to determine whether Everson's behavior on May 1, which resulted in his death, was a reasonably foreseeable consequence of Jordan's alleged failure two days earlier to properly diagnose and treat his psychosis. See *Brandvain*, supra, 188 Ga. App. at 115 (3) (b) (if varying inferences regarding reasonable apprehension of harm are possible, question is for jury).

Jordan also argues that the decision by Everson's parents to take him to Duke University rather than Middle Flint for treatment intervened to break the causal

20

connection. But "an intervening act does not break the causal connection between the defendant's conduct and the plaintiff's injury, if the intervening act was triggered by the defendant's conduct or could have reasonably been anticipated or foreseen by the defendant." *Textile Rubber & Chemical Co. v. Thermo-Flex Technologies*, 308 Ga. App. 89, 98 (2) (c) (706 SE2d 728) (2011). A jury could find that Jordan reasonably could have anticipated or foreseen that Everson, having been discharged from the hospital with a follow-up appointment with a mental health provider, would travel to see either the recommended provider or another provider. And a jury could find that Jordan's alleged negligence in misdiagnosing Everson and discharging him from the hospital triggered his parents' act of seeking mental health services elsewhere.

Moreover, when a defendant claims

> that its negligence is not the proximate cause of the plaintiff's injuries, but that an act of a third party intervened to cause those injuries, the rule is that an intervening and independent *wrongful* act of a third person producing the injury, and without which it would not have occurred, should be treated as the proximate cause, insulating and excluding the negligence of the defendant.

*Goldstein Garber & Salama, LLC v. J. B.*, __ Ga. __, __ (1) (__ SE2d __) (Case No. S16G0744, decided Feb. 27, 2017) (citation omitted; emphasis supplied). This

21

principle applies to the claims against Jordan brought by Everson's estate, to which Everson's parents are third parties. Jordan has offered nothing — no argument, citation to authority, or citation to the record — to support the proposition that the decision by Everson's parents to take him to Duke University rather than Middle Flint for further evaluation was a wrongful or negligent act.

For these reasons, we are not persuaded by Jordan's argument that he is entitled to summary judgment because there is no genuine issue of material fact as to causation.

*Judgments affirmed. Miller, P. J., concurs. McMillian, J., concurs fully in Divisions 1, 2, 4 and 5 and in the judgment only as to Division 3.*