309 Ga. 188
FINAL COPY

S19G0494, S19G0496. BOWDEN et al. v. THE MEDICAL
CENTER, INC.; and vice versa.

MELTON, Chief Justice.

In *The Med. Center v. Bowden*, 348 Ga. App. 165, 168 (820 SE2d 289) (2018), the Court of Appeals affirmed the decision of the Superior Court of Muscogee County to certify a class action lawsuit against The Medical Center, Inc. ("TMC"). The class representatives are uninsured patients who received medical treatment from TMC and who claimed that TMC charged them unreasonable rates for their medical care, which rates TMC then used as a basis for filing hospital liens against any potential tort recovery by the patients. The Court of Appeals also ruled on the causes of action raised by the plaintiffs. We granted certiorari to answer three questions: (1) Did the Court of Appeals err in its determination that class certification was proper? (2) Did the Court of Appeals err in affirming the denial of summary judgment for TMC on common law claims for fraud and negligent misrepresentation? and (3) Did the Court of Appeals err

in reversing the denial of summary judgment for TMC on the claims under the Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act, OCGA § 16-14-1 et seq.?[1] For the reasons that follow, we conclude that the Court of Appeals erred with regard to the first two questions, but properly decided the third. Accordingly, we affirm in part and reverse in part.

I.    *Factual and Procedural History.*

The relevant facts of record and the procedural history of this case are as follows: TMC treated Danielle Bowden for injuries that she suffered in a July 2011 auto accident. Bowden did not have health insurance, and TMC billed her $21,409.59 for her care. TMC filed a hospital lien in the full amount of the hospital's billed charges (the "chargemaster rate"[2]) against any potential tort recovery by

---

[1] Questions 1 and 2 relate to Case No. S19G0496, and question 3 relates to Case No. S19G0494.

[2] The Court of Appeals provides an accurate summary of what the "chargemaster rate" is and how it functions:

> Hospitals [like TMC] set their rates by calculating a "chargemaster rate," like the sticker price of a new car, for each service provided, and that rate applies to all patients receiving that particular service. The hospital determines its chargemaster rate by factoring in the cost of the service along with the overall

Bowden.[3] Meanwhile, in negotiations with Bowden over her accident

claims, the third-party liability insurer of the other vehicle involved

> costs of operating the hospital. Every patient is charged the chargemaster rate, but very few patients actually pay that amount because insurance companies, including Medicare, Medicaid, and other third-party payers, negotiate a reduced reimbursement rate. Thus, for patients with insurance, the insurance company will reimburse TMC pursuant to the negotiated rates. Additionally, Medicare and other government programs have a set methodology used to calculate their reimbursement amounts.
>
> Patients without any insurance or third-party payment source are billed the full chargemaster rate. For the relevant years pre-dating this lawsuit, the percentage of TMC patients who paid less than the chargemaster rate was 98.84 percent, while only 1.16 percent paid the full rate. Regardless of the reimbursement scheme, and despite the chargemaster rates, TMC collects, on average, about 33 percent of the chargemaster rate.
>
> To place this rate in context, [because] . . . Bowden's bills totaled approximately $21,000[,] [and] [b]ecause she lacked any insurance, she was billed that full amount. Had she been covered by Medicaid, the hospital would have received $9,895.24 for reimbursement. Medicare would have reimbursed $11,238.11, and Blue Cross/Blue Shield PPO would have paid $10,644.

(Footnote omitted.) *Bowden*, supra, 348 Ga. App. at 168.

[3] Under Georgia law, a hospital may pursue a lien for the reasonable charges for its treatment of an injured person against all causes of action accruing to that person as a result of those injuries. The hospital "shall have a lien for [its] reasonable charges," OCGA § 44-14-470 (b), and such a lien may be perfected by filing a verified statement of "the amount claimed to be due" pursuant to the procedures set forth in OCGA § 44-14-471 (a).

Pursuant to OCGA § 44-14-470 (b):

> Any person, firm, hospital authority, or corporation operating a hospital, nursing home, or physician practice or providing traumatic burn care medical practice in this state shall have *a lien for the reasonable charges* for hospital, nursing home, physician practice, or traumatic burn care medical practice care and treatment of an injured person, which lien shall be upon any

and all causes of action accruing to the person to whom the care was furnished or to the legal representative of such person on account of injuries giving rise to the causes of action and which necessitated the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice care, subject, however, to any attorney's lien. The lien provided for in this subsection is only a lien against such causes of action and shall not be a lien against such injured person, such legal representative, or any other property or assets of such persons and shall not be evidence of such person's failure to pay a debt. This subsection shall not be construed to interfere with the exemption from this part provided by Code Section 44-14-474 [dealing with money becoming due in connection with workers' compensation].

(Emphasis supplied.) And, under OCGA § 44-14-471 (a):

In order to perfect the lien provided for in Code Section 44-14-470, the operator of the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice:

(1) Shall, not less than 15 days prior to the date of filing the statement required under paragraph (2) of this subsection, provide written notice to the patient and, to the best of the claimant's knowledge, the persons, firms, corporations, and their insurers claimed by the injured person or the legal representative of the injured person to be liable for damages arising from the injuries and shall include in such notice a statement that the lien is not a lien against the patient or any other property or assets of the patient and is not evidence of the patient's failure to pay a debt. Such notice shall be sent to all such persons and entities by first-class and certified mail or statutory overnight delivery, return receipt requested; and

(2) Shall file in the office of the clerk of the superior court of the county in which the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice is located and in the county wherein the patient resides, if a resident of this state, a verified statement setting forth the name and address of the patient as it appears on the records of the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice; the name and location of the hospital, nursing home, physician practice, or provider of traumatic

in Bowden's accident, Enterprise Leasing Company-South Central, LLC ("Enterprise"), offered to settle with Bowden for its policy limit of $25,000. Bowden ultimately rejected the settlement offer because she and TMC could not reach an agreement on the amount to which TMC would be entitled from these proceeds.

Enterprise then filed an interpleader action against Bowden and TMC, depositing the $25,000 into the court registry. Bowden thereafter filed a cross-claim against TMC, alleging that her hospital bill based on the standard chargemaster rate was grossly excessive and did not reflect the reasonable value of her medical

---

burn care medical practice and the name and address of the operator thereof; the dates of admission and discharge of the patient therefrom or with respect to a physician practice, the dates of treatment; and *the amount claimed to be due* for the hospital, nursing home, physician practice, or provider of traumatic burn care medical practice care, which statement must be filed within the following time period:

(A) If the statement is filed by a hospital, nursing home, or provider of traumatic burn care medical practice, then the statement shall be filed within 75 days after the person has been discharged from the facility; or

(B) If the statement is filed by a physician practice, then the statement shall be filed within 90 days after the person first sought treatment from the physician practice for the injury.

(Emphasis supplied.)

treatment. Bowden pursued claims for, among other things, fraud, negligent misrepresentation, and violations of the Georgia RICO Act.

During the ensuing discovery period, in an effort to support her claim that TMC's chargemaster rates were unreasonable, Bowden sought information from TMC regarding its patient billing, liens, and charges for services provided to insured patients who received the same type of care as Bowden. TMC argued that the information sought by Bowden was irrelevant, but, in an appeal that eventually made its way to this Court, we concluded that

> where the subject matter of a lawsuit includes the validity and amount of a hospital lien for the reasonable charges for a patient's care, how much the hospital charged other patients, insured or uninsured, for the same type of care during the same time period is relevant for discovery purposes.

*Bowden v. The Med. Center*, 297 Ga. 285, 286 (773 SE2d 692) (2015) ("*Bowden I*"). We emphasized, however, that the information was relevant only "in the broad discovery sense," not that it was "dispositive of whether TMC's charges for Bowden's care were

'reasonable' under OCGA § 44-14-470 (b)." Id. at 292 (2) (a). After further discovery, TMC moved for summary judgment on all of Bowden's claims, which was denied.

Bowden subsequently amended her complaint, adding a request for injunctive relief; moved for leave to join three additional plaintiffs with similar claims, which was granted;[4] and filed a petition for class certification on behalf of patients against whom TMC had allegedly filed hospital liens in excess of reasonable charges based on its chargemaster rates. Following a hearing featuring testimony from experts on both sides regarding the reasonableness of TMC's charges and the feasibility of determining

---

[4] The three additional plaintiffs were Jaqueline Pearce, Karla Jasper, and Christian Sprouse. All of these additional plaintiffs, like Bowden, were uninsured at the time they were involved in car accidents caused by at-fault third parties; were treated for injuries at TMC; and had liens filed for the chargemaster amounts billed by TMC for the services rendered. Both Jasper and Sprouse have now satisfied their liens from proceeds received from their respective tortfeasors' insurers. In addition, TMC elected to cancel Bowden's lien at some unspecified point in the litigation. Thus, only one of the named plaintiffs --- Pearce --- at this point has a lien outstanding. For ease of reference, the four named plaintiffs will be referred to collectively as "Bowden."

damages on a class-wide basis, the trial court granted the petition for class certification, identifying the class as follows:

> All persons who have had a hospital lien filed pursuant to OCGA § 44-14-470 et seq., by TMC for the years 2007 to present against a cause of action they possessed and which lien was filed in an amount in excess of what is a reasonable charge for the care and treatment rendered.

In a divided opinion, the Court of Appeals majority held, among other things, that (1) although the trial court's stated definition of the class was overbroad, the court's decision to certify the class was nevertheless proper; (2) the trial court properly denied summary judgment for TMC on Bowden's fraud and negligent misrepresentation claims; and (3) TMC was entitled to summary judgment on Bowden's RICO claim. See *Bowden*, supra, 348 Ga. App. at 183-187. Judge Brown concurred in the judgment only, see id. at 187, and Judge Goss dissented in part, disagreeing that the plaintiffs' claims met the commonality requirement for a class action. Id. at 188-190. In Case No. S19G0496, TMC challenges the Court of Appeals' rulings on class certification and on the denial of summary judgment to TMC on the fraud and negligent

misrepresentation claims, and in Case No. S19G0494, Bowden challenges the Court of Appeals' ruling in favor of TMC on Bowden's RICO claim.

II. *Analysis.*

*Case No. S19G0496*

1. TMC contends that the Court of Appeals erred in affirming the trial court's decision to certify the class in this case. We agree.

(a) *Standard of Review.*

Because class actions represent "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," such actions are permitted "only in the limited circumstances described in OCGA § 9-11-23." (Citation and punctuation omitted.) *Georgia-Pacific Consumer Products v. Ratner*, 295 Ga. 524, 525 (1) (762 SE2d 419) (2014). Thus, while the decision to certify a class is a matter committed to the discretion of the trial court, any exercise of that discretion must comport with the requirements of the statute. Id. at 526 (1). "The party seeking to represent a class bears the burden of proving [to the trial court] that

class certification is appropriate" under the statute, and certification is "appropriate only to the extent that the trial court is satisfied, after a rigorous analysis, that the statutory requirements have been satisfied." (Citations and punctuation omitted.) Id. At 525-526 (1). This "rigorous analysis" of the statutory requirements will frequently

> entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.

(Citations and punctuation omitted.) *Wal-Mart Stores v. Dukes*, 564 U. S. 338, 351 (II) (A) (131 SCt 2541, 180 LE2d 374) (2011).[5] With this framework in mind, we address the Court of Appeals' decision to affirm the trial court's conclusion that class certification was warranted under OCGA § 9-11-23.

---

[5] We note that "[m]any provisions of OCGA § 9-11-23 were borrowed from Federal Rule of Civil Procedure 23, and for this reason, when Georgia courts interpret and apply OCGA § 9-11-23, they commonly look to decisions of the federal courts interpreting and applying Rule 23." *Ratner*, supra, 295 Ga. at 525 (1) n.3.

(b) *Statutory Requirements for Certifying a Class Under OCGA § 9-11-23.*

As a first step in showing that class certification is warranted, a plaintiff must satisfy all of the threshold factors of OCGA § 9-11-23 (a), which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if:
> (1) The class is so numerous that joinder of all members is impracticable;
> (2) There are questions of law or fact common to the class;
> (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) The representative parties will fairly and adequately protect the interests of the class.

If the plaintiff can satisfy the numerosity, commonality, typicality, and adequacy of representation factors of OCGA § 9-11-23 (a), she must then satisfy at least one of the three requirements of OCGA § 9-11-23 (b)[6] in order to show that class certification is

---

[6] OCGA § 9-11-23 (b) provides in relevant part:
An action may be maintained as a class action if the prerequisites of subsection (a) of this Code section are satisfied, and, in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:

appropriate. If, however, the plaintiff fails to meet even one of the threshold requirements of OCGA § 9-11-23 (a), there is no need to consider any of the other requirements of the statute, and the request for certification must fail. Id. See also *Ratner*, supra, 295 Ga. at 527 (1). As explained more fully below, because the threshold requirement of commonality is lacking in this case, the trial court abused its discretion in certifying the class, and the Court of Appeals erred in affirming the trial court's decision.

---

> (A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or
> (B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;
> (2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

(c) *Commonality.*

In *Dukes*, supra, the United States Supreme Court explained

commonality as follows:

> [C]ommonality [is] the rule requiring a plaintiff to show
> that "there are questions of law or fact common to the
> class." [Federal Rule of Civil Procedure] 23 (a) (2). That
> language is easy to misread, since "[a]ny competently
> crafted class complaint literally raises common
> 'questions.'" Nagareda, Class Certification in the Age of
> Aggregate Proof, 84 N.Y.U.L. Rev. 97, 131-132 (2009). . . .
> Commonality requires the plaintiff to demonstrate that
> the class members "have suffered the same injury," [*Gen.
> Tel. Co. of the Southwest v. Falcon*, 457 U. S. 147, 157 (102
> SCt 2364, 72 LE2d 740) (1982)]. This does not mean
> merely that they have all suffered a violation of the same
> provision of law. . . . Th[e] common contention . . . must be
> of such a nature that it is capable of classwide resolution
> – which means that determination of its truth or falsity
> will resolve an issue that is central to the validity of each
> one of the claims in one stroke. "What matters to class
> certification . . . is not the raising of common 'questions' –
> even in droves – but, rather, the capacity of a classwide
> proceeding to generate common *answers* apt to drive the
> resolution of the litigation. Dissimilarities within the
> proposed class are what have the potential to impede the
> generation of common answers." Nagareda, supra, at 132.

(Punctuation and footnote omitted; emphasis in original.) 564 U. S.

at 349-350 (II) (A). See also *Ratner*, supra, 295 Ga. at 527-528 (2).

As mentioned previously, the trial court defined the purported class in this case as

> [a]ll persons who have had a hospital lien filed pursuant to OCGA § 44-14-470 et seq., by TMC for the years 2007 to present against a cause of action they possessed and which lien was filed in an amount in excess of what is a reasonable charge for the care and treatment rendered.

In affirming the trial court's decision on commonality, the Court of Appeals majority opinion concluded that "[t]he common question applicable to all class members is whether the chargemaster rate, which universally served as the basis for the lien amount, was reasonable." *Bowden*, supra, 348 Ga. App. at 178 (2) (b). The majority then reasoned that, because (1) this Court concluded in *Bowden I*, supra, that the amounts TMC charged other patients could be relevant to the issue of reasonableness, and (2) Bowden's expert suggested "that charging uninsured patients the full chargemaster rates was unreasonable," a "jury [could] determine[ ] a formula for arriving at a reasonable charge" to resolve the common question on a class-wide basis. Id. at 176-178 (2) (b).

Accordingly, the Court of Appeals majority concluded that the commonality requirement had been satisfied. Id. at 178 (2) (b).

However, contrary to that conclusion, the proper legal analysis reveals that the "[d]issimilarities within the proposed class . . . impede the generation of common answers" to the common question raised. (Citation and punctuation omitted.) *Dukes*, supra, 564 U. S. at 350 (II) (A). As an initial matter, as the Court of Appeals majority conceded, the class as defined is overbroad in several respects, because it includes "both insured and uninsured people, those whose liens were removed, and those who never settled their lawsuits and thus paid nothing." *Bowden*, supra, 348 Ga. App. at 183 (2) (f).[7] Resolving the question of whether the chargemaster rate is reasonable for each of these differently situated class members

_____

[7] Also, despite acknowledging that "[t]here is no question that any class would exclude members whose claims are barred by the applicable statutes of limitation," the Court of Appeals summarily rejected TMC's argument that common law claims from some purported class members dating back to 2007 would be time-barred. *Bowden*, supra, 348 Ga. App. at 184 (2) (f). While we do not find the manner in which the Court of Appeals addressed this issue to be persuasive, because we conclude that commonality is lacking in this case without having to reach the issue of time-barred claims, we do not address it.

would necessarily "result[ ] in numerous individualized inquiries and answers," which would defeat commonality. *MCG Health v. Perry*, 326 Ga. App. 833, 836-839 (1) (755 SE2d 341) (2014) (reversing class certification on commonality grounds where patients with individualized insurance contracts challenged hospital liens that reflected standard hospital rates that were higher than negotiated payments hospital received from insurance companies).[8]

Moreover, even if the class were limited to uninsured patients who had a lien filed at the chargemaster rate against any potential

---

[8] The Court of Appeals majority concluded that "the overbroad definition of the class [was not] fatal in this case" because "the trial court retains the authority to limit or adjust the class as the evidence develops." *Bowden*, supra, 348 Ga. App. at 183-184 (2) (f), citing *J.M.I.C. Life Ins. Co. v. Toole*, 280 Ga. App. 372, 378 (2) (c) (634 SE2d 123) (2006) ("[T]he trial court retains jurisdiction to modify or even vacate [class certification orders] as may be warranted by subsequent events in the litigation."). But this argument is unpersuasive. The fact that a *trial court* can subsequently modify a properly certified class does not mean that the *Court of Appeals* can uphold the certification of a class that is *currently* improper. As the Court of Appeals acknowledged elsewhere in its discussion on commonality, "the decision whether to certify a class depends in large part upon *the description of the class*, the claims raised and the evidence and arguments presented in support of class certification. Accordingly, [the court] consider[s] th[e] case based upon the record before [it]." (Citation and punctuation omitted; emphasis supplied.) *Bowdon*, supra, 348 Ga. App. at 176 (2) (b).

tort recovery, commonality would still be lacking. Just because an uninsured patient is billed at the chargemaster rate does not necessarily mean the charge itself *is* unreasonable for that specific patient.

> Put differently, the legality – or ultimate reasonabl eness– of [TMC's] charges [to uninsured patients at the chargemaster rate] can only be determined by looking at the specific bills in question and analyzing them against factors like the market rate for the same services at other hospitals, [TMC's] internal costs for those particular services, and the prices [TMC] charged for those services to patients with health insurance or other benefits. . . . Therefore, at the level of specificity required to actually resolve the class claims, any commonality breaks down into an individualized inquiry.

*Colomar v. Mercy Hosp.*, 242 FRD 671, 676-677 (III) (A) (2) (S.D. Fla. 2007). See also *Maldonado v. Ochsner Clinic Foundation*, 493 F3d 521, 524 (II) (B) (5th Cir. 2007) (class certification denied to uninsured patients who claimed that chargemaster rates were unreasonable because "[t]he amount patients were charged and the amount that [was] 'reasonable' for the services they received [was] necessarily an individual inquiry that [would] depend on the specific circumstances of each class member, the time frame in which care

was provided, and both [the defendant hospital's] and other hospitals' costs at that time"); *Eufaula Hosp. Corp. v. Lawrence*, 32 S3d 30, 36 (Ala. 2009) (class certification denied to uninsured patients challenging chargemaster rates as unreasonable because "determining a reasonable charge for each class member requires individualized determinations"); *Howard v. Willis-Knighton Med. Center*, 924 S2d 1245, 1263 (La. App. 2006) ("reasonableness of charges inquiry requires individual considerations that may include . . . the patient's financial status, the actual hospital services rendered, their customary value, and the amount of a recovery from a third party").

Thus, even if a jury could, hypothetically, come up with an as-yet-to-be-determined "formula for arriving at a reasonable charge" (by comparing TMC's chargemaster rates to market rates, actual amounts collected by TMC from insurance companies, or some other number), *Bowden*, supra, 348 Ga. App. at 178 (2) (b), the answer to the question of what specifically constitutes a reasonable charge in each class member's case would still "require[ ] an individual

analysis of each medical service provided each class member." *Eufaula*, supra, 32 S3d at 43. In other words, while the question of what is a reasonable charge is common to the class, the *answer* to that question still varies from class member to class member and is not subject to being resolved "in one stroke" for the entire class, which defeats commonality, and which in turn undermines the animating purpose of a class action lawsuit. *Dukes*, supra, 564 U. S. at 350 (II) (A).

Finally, our decision in *Bowden I*, supra, supports, rather than undermines, this result. In *Bowden I*, "all we h[e]ld [was] that the discovery Bowden sought [on charges to other similarly situated patients] may have some relevance to the reasonableness of TMC's charges for her care." 297 Ga. at 293 (2) (a). We did not conclude that evidence of charges to other patients would be "*dispositive* of whether TMC's charges for Bowden's care [or charges for an entire class of patients] were 'reasonable' under OCGA § 44-14-470 (b), [particularly] to the extent that the other patients were not similarly situated in other economically meaningful ways." (Emphasis

supplied.) Id. at 292 (2) (a). In this regard, we noted that other evidence presented by TMC could affect the analysis of whether the chargemaster rate is reasonable in Bowden's individual case. For example:

> TMC would be entitled to present evidence and to argue in response [to Bowden] that what it charged its insured patients is not fairly comparable to what it charged uninsured patients like Bowden, because the insured patients were charged based on the hospital's contracts with their insurers that reasonably reflected such economic factors as volume discounts or promises of prompt and full payment, or based on the rates that the government was willing to pay under Medicare or Medicaid. See *Huntington Hosp. v. Abrandt*, [779 NYS2d 891, 892] (N.Y. App. Term 2004) ("The fact that lesser amounts for the same services may be accepted from commercial insurers or government programs as payment in full does not indicate that the amounts charged to defendant were not reasonable.").

Id. at 292-293 (2) (a).

Just as courts in other jurisdictions have recognized, see, e.g., *Colomar, Maldonado, Eufaula,* and *Howard*, supra, this Court recognized in *Bowden I* that charges to other similarly situated patients represent only one of several factors that could affect the reasonableness of charges to a different patient for her individual

treatment. This underscores the point that there is no "one size fits all" answer to the question of what may or may not constitute a reasonable charge for each individual patient in the purported class here.

For all of these reasons, the commonality factor of OCGA § 9-11-23 (a) (2) has not been satisfied in this case, and the trial court abused its discretion in certifying the class. See, e.g., *Colomar*, supra, 242 FRD at 677 (III) (A) (2), 683 (IV). Accordingly, the Court of Appeals erred in affirming that decision.[9]

---

[9] Because we resolve this issue based on lack of commonality, we need not address the other requirements for a proper class action. However, we note that we also doubt that the additional requirements of typicality or adequacy of representation were established here. As the United States Supreme Court concluded in *Falcon*, supra:

> The commonality and typicality requirements of Rule 23 (a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

457 U. S. at 157-158 (II) n.13. In this regard, the fact that Bowden's lien has already been canceled only highlights the difficulty that she would have in succeeding in her argument that her claims are typical of those of the class members or that she is an adequate representative for them.

2. We also agree with TMC that the Court of Appeals erred in upholding the trial court's decision to deny summary judgment to TMC on Bowden's fraud and negligent misrepresentation claims.

(a) *Standard of Review.*

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support such claims.

(Citations and punctuation omitted.) *Peterson v. Peterson*, 303 Ga. 211, 213 (1) (811 SE2d 309) (2018). Here, because TMC's filing of a lien at its chargemaster rate in compliance with Georgia's lien statutes does not amount to making a false representation, the

---

But we also must note that our conclusion that what constitutes a reasonable charge for a patient cannot be determined uniformly on a class-wide basis also refutes TMC's argument that the chargemaster rate is automatically a reasonable charge in all cases.

claims for fraud[10] and negligent misrepresentation[11] fail as a matter of law.

(b) *Compliance with Georgia's Hospital Lien Statutes.*

Bowden contends that, because OCGA § 44-14-470 (b) only allows TMC to "have a lien for [its] reasonable charges," TMC is guilty of making false representations if it files liens based on chargemaster rates that turn out to be unreasonable. However, an examination of the manner in which OCGA § 44-14-470 (b) is designed to operate in conjunction with OCGA § 44-14-471 for purposes of pursuing hospital liens shows that Bowden's argument is without merit. See *Land USA v. Ga. Power Co.*, 297 Ga. 237, 241

---

[10] "The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." *Crawford v. Williams*, 258 Ga. 806, 806 (375 SE2d 223) (1989).

[11] "Liability for . . . negligent [mis]representation attaches when a defendant makes a false representation upon which the plaintiff relies." *Global Payments v. Incomm Financial Svcs.*, __ Ga. __ (843 SE2d 821) (2020). "[T]he same principles apply to both fraud and negligent misrepresentation cases and . . . the only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed." (Citation and punctuation omitted.) *Holmes v. Grubman*, 286 Ga. 636, 640-641 (1) (691 SE2d 196) (2010).

(1) (773 SE2d 236) (2015) ("It is an elementary rule of statutory construction that statutes relating to the same subject matter are 'in pari materia' and must be construed together and harmonized whenever possible.").

OCGA § 44-14-470 (b) provides that a hospital "shall have a lien for [its] reasonable charges[.]" However, in order to perfect a lien for those "reasonable charges," a hospital must follow the procedures set forth in OCGA § 44-14-471 (a) (2) (A):

> In order to perfect [a hospital] lien *provided for in Code Section 44-14-470*, the operator of the hospital . . . [s]hall file in the office of the clerk of the superior court of the county in which the hospital . . . is located and in the [Georgia] county wherein the patient resides . . . a verified statement setting forth . . . *the amount claimed to be due for the hospital* . . . . within 75 days after the [patient] has been discharged from the facility[.]

(Emphasis supplied.) Thus, by filing a verified statement setting forth "the amount claimed to be due" within 75 days of a patient receiving treatment, a hospital perfects a lien for its "reasonable charges" as may be determined later. See id.

Pursuant to OCGA § 44-14-471 (a) (2) (A), the "amount [that the hospital] claim[s] to be due" for its services need not be "exact on the date [the lien is] filed." *Kight v. MCG Health*, 296 Ga. 687, 689 (1) (769 SE2d 923) (2015) ("There is nothing in OCGA § 44-14-470 et seq. imposing . . . a requirement [that a hospital lien be exact on the date that it is filed], and we will not judicially legislate one."). Indeed, because so many factors can affect the determination of what a "reasonable charge" may actually be for a hospital's services, see *Bowden I*, supra, 297 Ga. at 292-293 (2) (a), a hospital may not know within 75 days of providing medical services to a patient *exactly* what a reasonable charge is supposed to be under the circumstances. As a result, there is some flexibility in the initial OCGA § 44-14-471 (a) (2) (A) filing so long as there is some basis for what the hospital "claim[s] to be due." See *Aguila v. Kennestone Hosp.*, 353 Ga. App. 17, 21-22 (836 SE2d 179) (2019) (Dillard, P.J., concurring dubitante and concluding that, under Georgia's lien statutes, "there is no statutory requirement that hospitals must speculate as to whether their chargemaster rates will *ultimately* be

considered reasonable by plaintiffs, insurance companies, courts, or any other person or entity, *at the time they perfect their liens*") (emphasis supplied). And that is why, in general, the hospital's use of a standard charge for all patients who receive the same treatment can be sufficient for perfecting a hospital lien under Georgia's lien statutes. See *Kight,* supra, 296 Ga. at 688 n.1, 689 (1) (hospital lien that "represented the standard charge for [the patient's] treatment, not the discounted rate under [the patient's] insurance contract[,]  . . . was valid at the time that it was filed"); OCGA § 44-14-471 (a) (2) (A).

Once a hospital submits the "amount claimed to be due" pursuant to the terms of OCGA § 44-14-471 (a) (2) (A) to perfect a lien, OCGA § 44-14-470 (b) operates to ensure that any amount ultimately collected on the lien is only for the "reasonable charges" for a patient's care. Indeed, while the "amount claimed to be due" may serve as a starting point in an evaluation of what may or may not constitute a reasonable charge (and should have some basis to begin with), if it is later determined that the charge does not reflect

what is reasonable, the hospital will only be able to *collect* on the lien for the amount that actually *is* reasonable. See OCGA § 44-14-470 (b) (a hospital "shall have *a lien for [its] reasonable charges*") (eemphasis supplied).

Although the initial lien amount "claimed to be due" by TMC might vary from the ultimate "reasonable" amount that a hospital is able to collect, the standardized chargemaster rate used by TMC as a basis for the lien was based on real world factors such as the cost of TMC's services to its patients and the hospital's overall costs.[12] In other words, it cannot be said that TMC has no basis for using its chargemaster rates to come up with an "amount claimed to be due"

---

[12] The chargemaster is a detailed list specifying the charges for all procedures and treatments provided by TMC. In setting the chargemaster rates, TMC accounts for the mix of patients and payors responsible for payment and sets a goal of reaching an income threshold that permits the hospital to cover costs associated with operations. The mix of patients and payors affects how much TMC ultimately collects in payment because insurance providers contract for discounts from the chargemaster rate; federal and state laws determine amounts paid for the treatment of Medicare and Medicaid enrollees at levels lower than chargemaster rates; and many uninsured patients pay nothing for hospital treatment. TMC has contracted with Cleverley & Associates ("C&A") over the past decade to conduct pricing studies, evaluate the hospital's financial strength and market position, and calculate the chargemaster rates; C&A uses public and hospital-submitted data to develop the pricing for TMC's services.

for purposes of securing a lien for whatever its "reasonable charges" may ultimately be determined to be. That the amount that TMC initially has "claimed to be due" under OCGA § 44-14-471 (a) (2) (A) is significantly higher than the actual amount that TMC can collect on its lien as the "reasonable charges" to Bowden for her medical treatment does not establish fraudulent intent. See OCGA § 44-14-470 (b).

Reading OCGA § 44-14-471 (a) (2) (A) and OCGA § 44-14-470 (b) together, as we must, we conclude that there is nothing "fraudulent" about TMC using its standard chargemaster rates as "the amount claimed to be due for the hospital" to perfect its lien for its "reasonable charges" against Bowden's potential tort recovery. OCGA § 44-14-471 (a) (2) (A). See also *Kight*, supra, 296 Ga. at 688 n.1, 689 (1). If Bowden believes that the amount that TMC claims to be due does not reflect the reasonable charges for her medical treatment, she can contest the reasonableness of the amount, because OCGA § 44-14-470 (b) only authorizes a lien for the "reasonable charges" of TMC's medical services. Bowden cannot,

however, recast her challenge to the reasonableness of the chargemaster rates here as a claim for fraud or negligent misrepresentation where no such claims exist as a matter of law.

Accordingly, the Court of Appeals erred in affirming the trial court's denial of summary judgment to TMC on Bowden's fraud and negligent misrepresentation claims. We overrule *Clouthier v. Med. Center of Central Ga.*, 351 Ga. App. 883 (833 SE2d 584) (2019) and *Aguila*, supra, to the extent that they followed the Court of Appeals' holdings in this case to hold that viable claims for fraud, negligent misrepresentation, and violations of Georgia RICO[13] can be maintained against hospitals that properly file liens based on standard chargemaster rates that reflect true market considerations such as hospital costs. See *Aguila*, supra, 353 Ga. App. at 21-22 (Dillard, P. J., concurring dubitante and expressing doubt about whether *Clouthier* had been correctly decided).

*Case No. S19G0494*

---

[13] See Division 3, infra.

3. For the same reasons set forth in Division 2, supra, Bowden's Georgia RICO claims also fail as a matter of law. See OCGA § 16-14-3 (4) (A) and (5) (A) (violation of Georgia RICO Act requires that that a defendant engage in "at least two acts of racketeering activity" by committing one or more of the crimes set forth in OCGA § 16-14-3 (5) (A)); *Grauberger v. St. Francis Hosp.*, 169 FSupp.2d 1172, 1175 (N.D. Cal. 2001) (hospital did not commit any predicate offense that would support a RICO claim where the hospital filed a lien "to recover the difference between [the hospital's] 'normal rates' and the lower, negotiated rates that it charged plaintiff pursuant to her [insurance] plan"). Bowden contends that TMC has committed wire and mail fraud, see 18 USC §§ 1341 and 1343, extortion, see 18 USC § 1951 (b) (2), perjury, see OCGA § 16-10-70, and false statements, see OCGA § 16-10-20, by filing liens based on its chargemaster rates. However, because all of the alleged offenses depend on proving that TMC intentionally misrepresented the amount it claimed to be reasonable charges in filing the liens, and because we have already determined that the filing of liens

consistent with chargemaster rates in this case does not constitute fraudulent activity, the RICO claims also fail. See *Bowden*, supra, 348 Ga. App. at 185 (3) (a) ("Assuming TMC's lien amounts [based on its chargemaster rates] were [actually] unreasonable, such does not render the practice of filing liens, *as permitted by statute*, one of the RICO predicate offenses.") (emphasis supplied).

The Court of Appeals therefore properly concluded that TMC was entitled to summary judgment on Bowden's RICO claim.[14]

*Judgment affirmed in part and reversed in part. All the Justices concur, except Boggs, J., not participating, and Peterson, J., disqualified.*

---

[14] We note that this aspect of the Court of Appeals' majority opinion directly contradicts its (incorrect) ruling on the fraud and negligent misrepresentation claims that are predicates for the RICO claim. Based on the correct ruling on the fraud and negligent misrepresentation claims as discussed in Division 2, supra, a ruling in favor of TMC on the RICO claim follows as a matter of law.

DECIDED JUNE 29, 2020.

Certiorari to the Court of Appeals of Georgia — 348 Ga. App. 165.

*Bondurant, Mixson & Elmore, Frank M. Lowrey IV, Michael B. Terry, Michael R. Baumrind; Charles A. Gower, P.C., Charles A. Gower, C. Austin Gower, Jr.*, for appellants.

*Troutman Sanders, William N. Withrow, Jr., Lindsey B. Mann; Hall Booth Smith, Paul D. Ivey, Jr., Robert C. Martin, Jr., Lauren K. Dimitri; King & Spalding, Pete Robinson*, for appellee.

*Kilpatrick Stockton, Curtis A. Garrett, Jr., Robert P. Sentell III, Joseph H. Huff, James F. Bogan III*,  amici curiae (University Health Services, Inc.).

*Arnall Golden Gregory, Jason E. Bring, Chesley S. McLeod, W. Jerad Rissler*, amici curiae (Georgia Hospital Association and Georgia Alliance of Community Hospitals).