314 Ga. 519
FINAL COPY

S21G1250.  COE et al. v. PROSKAUER ROSE, LLP.

MCMILLIAN, Justice.

In 2002, Douglas Coe, Jacqueline Coe, and GFLIRB, LLC (collectively the "Coes") were involved in the sale of a company in which they held a substantial interest, and their accountants, BDO Seidman, LLP ("BDO"),[1] advised them of a proposed tax strategy in which the Coes could invest in distressed debt from a foreign company in order to offset their tax obligations. In connection with the proposed tax strategy, BDO advised the Coes to obtain a legal opinion from an independent law firm, Proskauer Rose LLP ("Proskauer"). The Coes followed BDO's advice, obtained a legal opinion from Proskauer, and claimed losses on their tax returns as a result. But in 2005, the Internal Revenue Service ("IRS") initiated

---

[1] BDO Seidman, LLP and its partners Kurt Huntzinger, Michael Whitacre, Denis Field, Charles Bee, Adrian Dicker, Robert Greisman, and Michael Kerekes are referred to collectively as "BDO."

an audit, which ultimately led to a settlement in 2012.

After settling with the IRS, the Coes filed suit against Proskauer in December 2015, asserting legal malpractice, breach of fiduciary duty, fraud, negligent misrepresentation, and other claims. After limited discovery on whether the statute of limitation barred the Coes' claims, the trial court concluded that it did and granted summary judgment in favor of Proskauer, and the Court of Appeals affirmed. See *Coe v. Proskauer Rose LLP*, 360 Ga. App. 68 (860 SE2d 630) (2021). We granted the Coes' petition for certiorari to address whether that holding was correct and conclude that it was not.[2] For the reasons set forth below, we reverse the judgment of the Court of Appeals and remand the case with instructions to reverse the trial court's order and remand the case for further proceedings

---

[2] We are aided by amicus curiae briefs filed by (1) Georgia-based accounting firms Amici Aprio, LLP; Bennett Thrasher, LLP; Frazier & Deeter, LLC; Hancock Askew & Co.; Mauldin & Jenkins LLC; and Nichols Cauley & Associates, LLC and (2) Georgia law firms Alston & Bird LLP; Coleman Talley LLP; DLA Piper (US) LLP; Drew Eckl & Farnham, LLP; Fisher & Phillips LLP; FordHarrison LLP; Hawkins Parnell & Young LLP; Hunter, Maclean, Exley & Dunn, P.C.; King & Spalding LLP; Maynard Cooper & Gale LLP; McGuireWoods LLP; Miller & Martin PLLC; and Morris, Manning & Martin LLP (joined by seven former presidents of the State Bar of Georgia).

consistent with this opinion.

1. *Background and Procedural History*.

Construed in the light most favorable to the Coes as the non-moving party on summary judgment,[3] the record shows that in October 2001, the Coes were approached by BDO regarding a proposed tax strategy in connection with the sale of a company in which the Coes held a substantial interest. BDO had been Douglas Coe's accounting firm since 1985, and the Coes "placed a tremendous amount of trust and faith in [it]."

BDO advised the Coes that adopting a distressed-debt strategy (the "Strategy") would result in a higher-than-average return on their investment while providing the Coes with legal tax benefits that they could use to offset the capital gains tax from the sale of the company. The Strategy involved investments in distressed debt with

---

[3] See *Doctors Hosp. of Augusta v. Alicea*, 299 Ga. 315, 315 (1) (788 SE2d 392) (2016) (when reviewing a motion for summary judgment, courts "construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences" (citation and punctuation omitted)).

Gramercy,[4] an experienced investment advisory company. BDO assured the Coes that the Strategy was legal and would be supported by a legal opinion letter (the "Opinion") from Proskauer, an independent law firm, and that the Opinion would satisfy the IRS that the Strategy complied with all applicable tax laws. BDO and Gramercy emphasized that the Opinion would allow the Coes to prevail in the event of an IRS audit and would provide protection from IRS penalties against the Coes.[5] Following BDO's and Gramercy's assurances about the Opinion and Proskauer's expertise in tax law and the Strategy, the Coes agreed to engage Proskauer to issue the Opinion.

In its March 22, 2002 engagement letter, Proskauer stated that it was "asked to represent [the Coes] in connection with rendering

---

[4] Gramercy Advisors LLC; Gramercy Financial Services, LLC; Gramercy Capital Markets Recovery Fund, LLC; Gramercy Emerging Markets Recovery Fund, LLC; KSHER AA, LLC; Marc Helie; and Jay Johnston are collectively referred to "Gramercy."

[5] The parties agree that a taxpayer's reliance on an independent legal opinion is a critical element of a "reasonable cause and good faith" defense to IRS penalties. See *Neonatology Assoc. v. Commr. Of Internal Revenue*, 115 T.C. 43, 98 (7) (2000), aff'd, 299 F3d 221 (3d Cir. 2002) ("The good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement.").

tax advice in connection with certain investment transactions that [the Coes] conducted in 2001" and that, in connection with the investment transactions, Proskauer would charge $30,000, payable upon execution of the engagement letter. Also, the letter provided:

> We have advised you that we also represent BDO Seidman, LLP and Gramercy Advisors and their affiliated entities in connection with various matters. You acknowledged and expressly agreed that we would be free to continue to represent BDO Seidman, LLP and Gramercy Advisors and you waived any conflict resulting from or attributable to such representation.[6]

On April 15, 2002, Proskauer issued the Opinion to the Coes. In the Opinion, Proskauer first outlined the various entities involved in the Strategy, the representations made by those entities, and the agreements documenting the various transactions. Proskauer then rendered a number of opinions on discrete issues regarding the Strategy, ultimately concluding that there was a

---

[6] Douglas Coe averred that other than a brief conversation with Ira Akselrad at Proskauer, in which Akselrad asked Coe to sign the engagement letter, he had no other conversations with anyone from Proskauer and that Akselrad did not provide any details about Proskauer's relationship with BDO and Gramercy.

"greater than fifty percent likelihood that the tax treatment of the [Strategy] would be upheld if challenged by the [IRS]" and that the investor "should not be subject to a penalty" under multiple code sections.[7] The Opinion also provided a substantial, over-70-page legal analysis supporting the various opinions provided therein. Relying on the Opinion, the Coes then included the losses generated by the Strategy on their tax return for the 2001 tax year.

The IRS initiated an audit of the Coes' 2001 tax return on January 11, 2005, and the Coes retained the law firm of Chamberlain Hrdlicka ("Chamberlain")[8] to represent them during the audit. Eventually, the Coes entered into a settlement agreement with the IRS in January 2012. During that time period, a number of news reports publicized the IRS's investigations of similar tax strategies. In 2005, a United States Senate subcommittee report

---

[7] The same day, BDO issued an almost identical opinion letter to the Coes.

[8] Proskauer characterizes Chamberlain as "sophisticated tax counsel." Douglas Coe averred that "[i]t was not within the scope of Chamberlain Hrdlicka's agency relationship with [Coe] to apprise [Coe] of all publicly available facts that might bear upon claims against my former professional advisors." No other evidence of the scope of Chamberlain's services, such as an engagement letter, appears in the record.

concluded that tax avoidance transactions like the Strategy "required close collaboration between accounting firms, law firms, investment advisory firms, and banks," and in 2008, an IRS notice identified similar distressed-debt transactions as improper tax avoidance strategies subject to penalties. Also, beginning in 2009, several BDO partners entered guilty pleas to counts of conspiracy to defraud the United States and to tax evasion in connection with tax shelters similar to the Strategy that they promoted to other clients. In June 2012, BDO entered into a deferred-prosecution agreement with the United States Department of Justice relating to the fraudulent marketing and selling of illegal tax shelters.[9]

After their settlement with the IRS, the Coes retained separate counsel, Loewinsohn Flegle Deary Simon LLP ("Deary"), to pursue their claims against Proskauer. In December 2015, the Coes filed suit against Proskauer, asserting legal malpractice, breach of fiduciary duty, negligent misrepresentation, fraud, and other

---

[9] Neither the BDO partners' guilty pleas nor the deferred-prosecution agreement specifically referenced Proskauer's involvement.

claims. In support of their claims, the Coes alleged that Proskauer and BDO were not independent, and instead Proskauer, BDO, and Gramercy jointly designed, promoted, and implemented the Strategy as part of a conspiracy.[10] Specifically, they alleged that Proskauer had an illegal business arrangement with BDO and Gramercy, whereby BDO recommended that Proskauer provide opinion letters to BDO's clients in connection with the Strategy, and that Proskauer knowingly allowed BDO to use its legal opinion letters to market the Strategy to its clients. According to the Coes, the Opinion was not tailored to their circumstances, but rather was

---

[10] In opposition to the motion for summary judgment, the Coes submitted the affidavit of Charles Bee, a former BDO Vice-Chairman, who had pleaded guilty to crimes arising out of BDO's activities in designing and marketing various tax shelters, including those involving options and distressed debt. As to BDO's relationship with Proskauer, Bee averred:

> During the time period that the BDO Tax Solutions Group was functioning, one of the law firms with whom the BDO Tax Solutions Group had a significant relationship was the Proskauer Rose law firm from New York; the lead attorney there on tax shelter matters was an attorney named Ira Akselrad. Proskauer was involved both in writing opinion letters for clients of BDO and also in providing direct legal advice to BDO regarding these shelters. I would characterize Proskauer as one of the "go to" law firms that BDO used and on whom it relied for advice about these transactions, including the distressed debt transactions that BDO promoted to its clients.

a boilerplate opinion letter that was part of this pre-planned scheme. And although Proskauer represented and advised the Coes that the Strategy was a legal investment strategy, Proskauer had knowledge that federal authorities were investigating the legality of similar tax shelters and that the IRS was auditing and disallowing similar tax strategies.

Furthermore, the Coes alleged that there was an undisclosed fee-splitting arrangement between Proskauer, BDO, and Gramercy wherein they would split substantial fees based on the size of the distressed debt rather than an hourly rate. Proskauer never informed the Coes that Proskauer represented and advised BDO on the Strategy specifically. However, in the spring of 2002, as BDO's counsel, Proskauer advised BDO that any taxpayer claiming Strategy losses on a tax return would face a 100 percent chance of an IRS audit. But Proskauer never informed the Coes that it represented BDO on the Strategy, that it gave BDO materially different advice regarding the Coes' chance of an IRS audit, or that the IRS considered the Strategy an illegal tax shelter. Despite this

9

knowledge, Proskauer maintained in its Opinion that the Coes "should not" incur IRS penalties.

The Coes have asserted that they had no knowledge that Proskauer was not independent from BDO; that Proskauer was participating in any improper conduct; that certain BDO partners were convicted in 2009; of news coverage of the same or similar tax strategies as the Strategy; or of the litigation against accounting and law firms regarding the same or similar transactions as the Strategy.

Proskauer filed a motion to dismiss the complaint on several grounds, including that the Coes' claims were barred by the applicable statute of limitation because they were on notice of their claims no later than February 13, 2009, when the first of four BDO partners pleaded guilty to crimes associated with similar tax avoidance strategies and that tolling based on alleged fraudulent concealment did not apply.[11] After the Coes responded to the motion

---

[11] OCGA § 9-3-96 provides: "If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred

10

to dismiss, the trial court converted the motion into a motion for summary judgment and ordered the parties to simultaneously submit evidence pertinent to the motion, which was subsequently supplemented following discovery limited to the issues raised in the motion to dismiss.

Following a hearing, the court granted Proskauer's motion for summary judgment. The trial court reasoned that the four-year statute of limitation for each of the Coes' claims began to run in 2002, when the Coes undertook the underlying Strategy or alternatively in 2009, when the first of the BDO partners entered his criminal guilty pleas. As for tolling under OCGA § 9-3-96, the trial court concluded that it did not apply because the fraud alleged to have tolled their claims was the same fraud about which the Coes were suing and because failure to disclose one's alleged malpractice is not fraud.

The Coes appealed, arguing that the statutes of limitation had

from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."

11

not begun to run on their claims and that, alternatively, the trial court erred in finding that the applicable statutes of limitation for their causes of action were not tolled by Proskauer's fraud. The Court of Appeals affirmed the trial court's grant of summary judgment to Proskauer but on somewhat different grounds. The Court of Appeals analyzed the legal malpractice, fraud, negligent misrepresentation, and breach of fiduciary duty claims jointly, concluding that a four-year statute of limitation applied to those claims and that they accrued in 2002 when the alleged breach and malpractice occurred. As for tolling, the Court of Appeals concluded that the Coes had failed to meet their burden of showing that the statute of limitation was tolled because the Coes, exercising ordinary care, should have been on notice of their claims based on news reports about similar tax shelters promoted by BDO, which had been determined to be illegal, and that the Coes were aware through the engagement letter that Proskauer was doing some work for BDO. See *Coe*, 360 Ga. App. at 73 (2).

We granted the Coes' petition for certiorari and posed the

12

following questions:

> 1. Were the [Coes]' claims of fraud and negligent misrepresentation barred by the four-year statute of limitations period applicable to legal malpractice claims?
> 2. Did the [Coes] fail, as a matter of law, to exercise ordinary care to discover [Proskauer's] allegedly fraudulent acts?

2. *Statutes of Limitation Applicable to Fraud and Negligent Misrepresentation Claims.*

It is well settled that the statute of limitation for fraud and negligent misrepresentation claims is found in OCGA § 9-3-31,[12] while the statute of limitation for legal malpractice claims is set out in OCGA § 9-3-25.[13] See *Armstrong v. Cuffie*, 311 Ga. 791, 793 (1) n.4 (860 SE2d 504) (2021) ("It has long been the law in this state that a cause of action for legal malpractice, alleging negligence or unskillfulness, is subject to the four-year statute of limitation in OCGA § 9-3-25." (citation and punctuation omitted)); *Anthony v.*

---

[12] OCGA § 9-3-31 provides: "Actions for injuries to personalty shall be brought within four years after the right of action accrues."

[13] OCGA § 9-3-25 provides in relevant part: "All actions upon open account, or for the breach of any contract not under the hand of the party sought to be charged, or upon any implied promise or undertaking shall be brought within four years after the right of action accrues."

13

*American Gen. Financial Svcs.*, 287 Ga. 448, 461 (4) (697 SE2d 166) (2010) (applying four-year statute of limitation provided in OCGA § 9-3-31 to plaintiffs' claim for fraud arising from economic loss); *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426 (1) (479 SE2d 727) (1997) (applying four-year limitation period for negligent misrepresentation action claiming injury to personalty as set forth in OCGA § 9-3-31).

Here, the Court of Appeals focused its analysis on the Coes' legal malpractice claim, determining that the limitations period began to run "from the date of the breach of the duty and not from the time when the extent of the resulting injury is ascertained nor from the date of the client's discovery of the error." *Coe*, 360 Ga. App. at 71 (1) (citation and punctuation omitted). In so doing, the court rejected the Coes' assertion that malpractice claims involving pending proceedings such as the IRS audit do not accrue until the termination of the administrative proceeding.[14] See id. at 72 (1).

---

[14] This issue does not fall within the scope of the questions that we posed on granting the Coes' petition for certiorari. Therefore, we decline to address

14

However, the Court of Appeals erred by failing to separately analyze the Coes' fraud and negligent misrepresentation claims. Although both statutes of limitation include the same language — that the relevant action must be brought within four years "after the right of action accrues" — fraud, negligent misrepresentation, and legal malpractice claims each requires different elements. Therefore, even though the Coes' claims arose from the same series of transactions with BDO and Proskauer, each claim should have been analyzed separately to determine when the right of action accrued for that particular claim. See *Daniel v. Ga. R. Bank & Trust Co.*, 255 Ga. 29, 30 (334 SE2d 659) (1985) ("Various causes of action in tort arising from the same set of facts may commence running at different times depending on the nature of the several causes of action involved, and the fact that the statute has run as to one does not necessarily mean that the statute has run as to all."). See also *Green v. White*, 229 Ga. App. 776 (494 SE2d 681) (1997) (separately

the Coes' arguments to this Court that their malpractice claims did not accrue until the Coes paid penalties to the IRS. See Supreme Court Rule 45.

15

analyzing the timeliness of legal malpractice and fraud claims based on the same representation).

Turning to the Coes' claims as alleged in their second amended complaint,[15] the essential elements for a claim of negligent misrepresentation are:

> (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.

*Hardaway*, 267 Ga. at 426 (1) (citation omitted). "Because the resulting loss must necessarily occur *after* the negligent act and reliance thereon, the statute of limitation runs from that point." Id. at 427 (1) (emphasis supplied). Accordingly, until economic loss is *actually* sustained by a plaintiff, he does not have a cause of action, and the statute of limitation "cannot commence until such loss is sustained with certainty." Id. at 427-28 (1) (acknowledging that

---

[15] In moving for summary judgment on the issue of when these claims accrued, Proskauer focused its arguments on when the Coes suffered damages and has not disputed the merits of the Coes' claims. Thus, we treat these allegations as undisputed for purposes of this analysis.

"[w]ith the benefit of hindsight, we can see now that at the time [the plaintiff] signed the contract, it may have been *foreseeable,* or even *likely,* that it would lose money due to delays caused by apparent errors in the initial designs," but holding nonetheless that "the statute of limitation begins to run when the plaintiff suffers pecuniary loss with certainty, and not as a matter of pure speculation" (emphasis in original)).[16]

---

[16] In Count III of their second amended complaint, the Coes alleged that during the course of its representation, Proskauer "negligently made numerous affirmative representations that were improper, incorrect and/or false; negligently omitted numerous material facts; and negligently gave numerous improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to [the Coes]." The Coes further alleged that they reasonably relied on Proskauer's representations that Proskauer either knew or reasonably should have known were improper, inaccurate, or wrong. And the Coes alleged that, but for this reliance, they would not have failed to pursue amnesty programs that the IRS was offering for participants in similar tax shelters.

The Coes identified the following injuries proximately caused by Proskauer's alleged negligent misrepresentation:

(1) they paid substantial fees/monies to [Proskauer] and the Strategy Participants, (2) they unnecessarily purchased the [Strategy] and made other investments to effectuate the [Strategy], (3) they made additional investments in Gramercy's fund as part of the [Strategy], (4) they have been assessed and owe substantial back-taxes, interest, and penalties and will be assessed additional such amounts, (5) they paid substantial money/fees to lawyers and accountants and incurred other expenses in connection with [the] audit, (6) they have and will continue to incur substantial additional costs in hiring new tax and legal advisors to

17

"The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." *Bowden v. The Medical Center, Inc.*, 309 Ga. 188, 199 (2) (a) n.10 (845 SE2d 555) (2020) (citation and punctuation omitted). See also *Holmes v. Grubman*, 286 Ga. 636, 640-41 (1) (691 SE2d 196) (2010) (explaining that "the same principles apply to both fraud and negligent misrepresentation cases and that the only real distinction between [the two claims] is the absence of the element of knowledge of the falsity of the information disclosed" (citation and punctuation omitted)). As with negligent misrepresentation, "[t]o establish a cause of action for fraud, a plaintiff must show that *actual* damages, not simply nominal damages, flowed from the fraud alleged." *Glynn County Fed. Employees Credit Union v. Peagler*, 256 Ga. 342, 344 (2) (348 SE2d 628) (1986) (emphasis supplied).[17]

rectify the situation, [and] (7) . . . they lost the opportunity to avail themselves [of] other legitimate tax-savings opportunities.

[17] In Count IV of their second amended complaint, the Coes alleged that

18

Proskauer "made numerous knowingly false affirmative representations and intentionally omitted numerous material facts to [the Coes,]" reciting 78 paragraphs enumerating the alleged fraud, including:

> (3) Failing to disclose in the [Opinion] or otherwise the actual roles and relationships of the Strategy Participants (e.g., the conspiracy) in the . . . Strategy;
>
> (4) Failing to disclose in the [Opinion] or otherwise that Proskauer . . . and the Strategy Participants were splitting and/or sharing fees;
>
> . . .
>
> (8) Failing to advise [the Coes] in the [Opinion] or otherwise that the [Opinion] was not an "independent" legal opinion from an "independent" law firm;
>
> . . .
>
> (10) Failing to advise [the Coes] that the [Opinion] could not be relied upon by [the Coes] to protect [the Coes] from incurring penalties if audited;
>
> . . .
>
> (18) Failing to advise [the Coes] that Proskauer . . . had already prepared a "form" opinion letter approving the . . . Strategy and needed to only fill in several blanks for each of the many clients to which it rendered such opinion letter;
>
> . . .
>
> (42) Failing to advise [the Coes] in the [Opinion] or otherwise that the purchase, sale, and/or exchange of the distressed debt investments were not arms-length transactions;
>
> . . .
>
> (46) Failing to advise [the Coes] in the [Opinion] or otherwise that Gramercy would not perform collection efforts on the distressed debt investments;
>
> . . .
>
> (53) Failing to advise [the Coes] that the purpose of the [Opinion] was to induce clients to purchase tax shelters; [and]
>
> . . .
>
> (57) Failing to advise [the Coes] that Proskauer . . . and its co-conspirators unlawfully, willfully, and knowingly devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent

Thus, to maintain their negligent misrepresentation and fraud claims, the Coes were required to have sustained actual damages with certainty. See *Hardaway*, 267 Ga. at 427-28 (1); *Peagler*, 256 Ga. at 344 (2). On appeal, the Coes argue that they did not suffer an actual injury until the IRS rejected Proskauer's faulty tax advice and imposed penalties in 2012 because the parties had contemplated that the Coes would incur fees for the Opinion and potential audit expenses, but not that they would incur IRS penalties. However, this argument is belied by the Coes' complaint. The damages that the Coes alleged with respect to their negligent misrepresentation and fraud claims include the fees that they paid in reliance on what the Coes now contend are misrepresentations and material nondisclosures in the Opinion and engagement letter, and it is undisputed that the Coes paid Proskauer's fees. We recognize that,

pretenses, representations, and promises, to wit, a scheme to defraud the IRS through the design, marketing, and implementation of fraudulent tax shelter transactions[.]

The Coes identified the same injuries proximately caused by Proskauer's alleged fraud as they did for their negligent misrepresentation claim.

20

oftentimes, it is only with the benefit of hindsight that a plaintiff is able to ascertain that he has not received the benefit of his bargain as a result of fraud or negligent misrepresentation. Nonetheless, because the Coes could have maintained their claims of negligent misrepresentation and fraud at the point when they relied on those representations and paid those fees in 2002, their claims of negligent misrepresentation and fraud began to accrue at that time. See *Hardaway*, 267 Ga. at 426 (1); *Peagler*, 256 Ga. at 344 (2). That the Coes also alleged additional, later economic damages arising from Proskauer's actions does not change the fact that the statutes of limitation for their negligent misrepresentation and fraud claims began to run on the date that they *first* could have successfully maintained those actions. See *Colormatch Exteriors v. Hickey*, 275 Ga. 249, 251 (1) (569 SE2d 495) (2002) ("The true test to determine when a cause of action accrues is to ascertain the time when the plaintiff could first have maintained his or her action to a successful result." (citation and punctuation omitted)).

Proskauer argues that the Coes should not be able to

circumvent the malpractice limitation period by asserting fraud and negligent misrepresentation claims where "the duties arose from the same source (that is, the attorney-client relationship), were allegedly breached by the same conduct, and allegedly caused the same damages." *Anderson v. Jones*, 323 Ga. App. 311, 318 (2) (745 SE2d 787) (2013). See *Griffin v. Fowler*, 260 Ga. App. 443, 450 (2) (579 SE2d 848) (2003) ("[T]he damages flowing from [the plaintiff's] separate claim that [the defendant] fraudulently misrepresented his expertise or experience to induce employment are no different from the damages flowing from the alleged legal malpractice. Therefore . . . there [would be] no separate cause of action for fraud apart from the malpractice claim[.]"). As an initial matter, neither *Anderson* nor *Griffin* involved a grant of summary judgment based on a statute of limitation and are not applicable here, and *Anderson* addressed overlapping breach of fiduciary duty and legal malpractice claims, which is not at issue in this appeal. However, to the extent that the language in these cases can be construed to support that fraud and negligent misrepresentation claims are always duplicative of legal

malpractice claims if based on the same facts and that those fraud and negligent misrepresentation claims will fail on statute of limitation grounds in the same way as the legal malpractice claim, these cases are disapproved.[18] See *Daniel*, 255 Ga. at 31 (explaining that tort claims may have different elements and must be analyzed separately to determine when each claim has accrued).

3. *Whether the Coes Failed to Exercise Reasonable Diligence as a Matter of Law.*

Having determined that the Coes' fraud and negligent misrepresentation claims accrued in 2002, more than four years before the Coes filed their lawsuit in 2015, we must now turn to the question of whether the Court of Appeals correctly determined that the statutes of limitation for the Coes' claims were not tolled because "there was sufficient evidence that the [Coes], exercising ordinary

---

[18] We note an additional case with similar language that is not cited by Proskauer. See *Stewart v. McDonald*, 347 Ga. App. 40, 50 (3) (815 SE2d 665) (2018) ("[The plaintiff's] claims for damages for fraud and breach of fiduciary duty are factually based upon [the defendant's] breach of his fiduciary duties to [the plaintiff] in the performance of his duties as a lawyer, so the claims are duplicative of [the plaintiff's] legal malpractice claim.").

care, should have been on notice regarding the issues surrounding the distressed debt strategy." *Coe*, 360 Ga. App. at 73 (2).

OCGA § 9-3-96 provides that when a defendant is "guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." As we recently explained, in order to toll a limitation period under this statute, a plaintiff must make three showings:

> first, that the defendant committed actual fraud; second, that the fraud concealed the cause of action from the plaintiff, such that the plaintiff was debarred or deterred from bringing an action; and third, that the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the statute of limitation.

*Doe v. St. Joseph's Catholic Church*, 313 Ga. 558, 561 (2) (870 SE2d 365) (2022) (citation and punctuation omitted).

Proskauer does not dispute that the Coes carried their burden to show fraud for purposes of summary judgment; thus, consistent with the second question posed in granting certiorari, our inquiry is

24

focused on the third requirement.[19] "Fraud will toll the limitation period only until the fraud is discovered or by reasonable diligence should have been discovered." *Doe*, 313 Ga. at 568 (2) (citation and punctuation omitted). "Reasonable diligence cannot be measured by a subjective standard, but, rather, must be measured by the prudent man standard, which is an objective one." Id. (citation and punctuation omitted). However, "[w]here a confidential relationship[20] exists, a plaintiff does not have to exercise the degree

---

[19] While Proskauer does not dispute that the Coes carried their burden to show fraud, it does argue in the alternative that the Coes failed to establish that Proskauer's alleged fraud "debarred or deterred" them from discovering their causes of action after they retained new counsel in 2005 because the Coes were "no longer deterred from learning the true facts." However, because this issue is outside the scope of the questions posed in granting certiorari, we decline to address it. See Supreme Court Rule 45.

[20] "A 'confidential' relationship exists 'where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another, or where, from a similar relationship of mutual confidence, the law requires the utmost good faith.'" *Doe*, 313 Ga. at 562 (2) (quoting OCGA § 23-2-58). The parties do not dispute that a confidential relationship existed between Proskauer and the Coes, at a minimum, during the period of time when Proskauer was actively representing the Coes in drafting the Opinion. However, after that point in time, the parties diverge in their views of the duty Proskauer retained to the Coes and the concomitant degree of care that the Coes were required to exercise. We need not parse this issue at this time because, as we explain below, even assuming that Proskauer's heightened duty to the Coes expired upon release of the Opinion, genuine issues of material fact exist as to whether the Coes exercised reasonable diligence to discover their causes of action.

of care to discover fraud that would otherwise be required, and a defendant is under a heightened duty to reveal fraud where it is known to exist." *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 848 (1) (507 SE2d 411) (1998). "Put another way, a confidential relationship imposes a greater duty on a defendant to reveal what should be revealed, and a lessened duty on the part of a plaintiff to discover what should be discoverable through the exercise of ordinary care." Id.

Also, in resolving this question, it is important to keep in mind the procedural posture of this case — that we are reviewing the grant of a motion for summary judgment. "On appeal from the grant of summary judgment, we construe the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible inferences" and is "only required to present evidence that raises a genuine issue of material fact." *Nguyen v. Southwestern Emergency Physicians*, 298 Ga. 75, 82 (3) (779 SE2d 334) (2015) (citation and punctuation omitted).

With these principles in mind, we turn to Proskauer's theories

26

as to why the Coes could have discovered their claims with reasonable diligence no later than 2009. First, Proskauer argues that as of March 2002, the Coes had actual notice that Proskauer was not an independent law firm based on the information provided in Proskauer's engagement letter. Second, Proskauer argues that the Coes had constructive knowledge by 2009 of Proskauer's alleged misrepresentations in the Opinion when it became "widely known" that the IRS was pursuing entities involved in tax avoidance schemes like the Strategy.

As for the claims that Proskauer failed to disclose that it was not an independent law firm, Douglas Coe submitted an affidavit that he was unaware that Proskauer advised BDO on the Strategy and thus was not an independent law firm. Moreover, the engagement letter only vaguely referred to matters in which Proskauer represented BDO and did not disclose Proskauer's role in crafting the Strategy and sharing in fees earned. And it is undisputed that this failure to disclose was made during Proskauer's active representation of the Coes such that Proskauer

27

had a higher duty to disclose material facts. See *Hunter*, 269 Ga. at 848 (1). We fail to see why a person exercising reasonable diligence would not be entitled to rely on the disclosure or lack thereof made by his or her attorney even after the legal engagement was completed, at least until other facts come to light that would cause a reasonably diligent person to revisit the issue. Thus, a genuine issue of material fact exists as to whether the Coes had actual knowledge about Proskauer's lack of independence, and we cannot say that, as a matter of law, the Coes had knowledge that Proskauer was not an independent law firm based solely on the language in the engagement letter.

As for its argument that the Coes had constructive notice of the alleged misrepresentations and material omissions made in the Opinion, Proskauer submitted an excerpt of 98 selected sources to the trial court as evidence that the Coes should have been on notice of their claims against Proskauer well before 2011. These sources included an episode of CBS 60 Minutes, two congressional reports, and publications from various news outlets, which emphasized

28

BDO's role and related claims against law firms arising from faulty tax advice.

Notably, only two of the articles specifically mentioned Proskauer: one article in Crain's New York Business and one article in The New York Times, which stated that evidence of a coordinated partnership between BDO and Proskauer was lacking.[21] We are not persuaded by Proskauer's characterization of this information, involving highly complex investment and tax transactions, as so "widely known" as to establish, as a matter of law, that the Coes, in exercising reasonable diligence, should have discovered their claims before 2011.[22]

---

[21] See Tommy Fernandez, Tax Shelter Crackdown Hits Law Firms, Crain's N.Y. Bus. June 14, 2004, 2004 WLNR 1763012 (noting that tax shelter litigator David Deary "says he will file suits against two other New York firms, Proskauer Rose and Pryor Cashman Sherman & Flynn" based on their marketing and selling of the illegal tax shelters); Lynnley Browning, U.S. is Denied Most Papers Sought from Auditing Firm, N.Y. Times July 7, 2004, https://www.nytimes.com/2004/07/07/business/us-is-denied-most-papers-sought-from-auditing-firm.html (discussing a federal judge's ruling that "'evidence of any such coordinated partnership between BDO Seidman and [Proskauer] is lacking'" and the judge's conclusion that "the evidence of favorable opinion letters . . . 'standing alone, [is] not enough for this court to conclude that [Proskauer] and BDO were promoters'").

[22] Although in a different procedural posture, we find it instructive that

29

And there is no evidence in the record that the Coes were specifically aware of the reports identified by Proskauer. To the contrary, Douglas Coe submitted an affidavit that, prior to 2012, he was not aware of the BDO partners' convictions, of Proskauer's participation in any improper conduct, or of any other allegations in the Coes' complaint. And in a subsequent affidavit, he specifically denied having seen any of the documents, articles, television broadcasts, or other lawsuits referenced by Proskauer. Thus, a genuine issue of material fact exists as to whether the Coes had actual knowledge of, or should have discovered with reasonable diligence, the news reports and other lawsuits referencing Proskauer.

Moreover, we conclude that the Coes produced evidence

---

in *Doe* we explained that the allegations in that complaint adequately pleaded tolling under OCGA § 9-3-96 because "[t]his is not a case where the allegations in the complaint establish as a matter of law that the plaintiff could have easily discovered the fraud alleged from a readily available public source, that the plaintiff in fact knew about the alleged fraud when it occurred, or that the plaintiff was on clear notice that the defendant had defrauded him." *Doe*, 313 Ga. at 570 (2) n.10. Likewise, the existence of news reports and other lawsuits referencing Proskauer and BDO does not establish as a matter of law that the Coes could have discovered their claims against Proskauer through the exercise of reasonable diligence.

sufficient to support that they exercised reasonable diligence to discover their causes of action within the limitations period. Most notably, after the IRS initiated its audit in 2005, the Coes did not simply ignore the problem; they hired independent counsel with an established reputation in tax matters to assist them in the audit process. See *Scully v. First Magnolia Homes*, 279 Ga. 336, 339 (2) n.11 (614 SE2d 43) (2005) ("questions of reasonable diligence must often be resolved by the trier of fact"); *Sanders v. Looney*, 247 Ga. 379, 381 (3) (276 SE2d 569) (1981) (holding that the question of the plaintiffs' exercise of proper diligence was for the jury and noting that the existence of a confidential relationship may justify the plaintiffs' reliance on representations and excuse the failure to make their own determination).

Proskauer also argues that Chamberlain, as sophisticated tax counsel, either knew or should have known the basis for all of the Coes' claims against Proskauer and that in any event, as the Coes' counsel, Chamberlain's constructive knowledge was imputed to the Coes for purposes of determining tolling. Pretermitting whether

constructive knowledge of legal counsel is imputed to the client in these circumstances, there is no evidence in the record of what Chamberlain knew about Proskauer's role in the Strategy, other than the fact that Proskauer had provided legal and tax advice to the Coes, or that Chamberlain actually was aware of the IRS's efforts against similar tax shelters. Moreover, there is no evidence in the record showing what Chamberlain should have known, only Proskauer's legal argument that Chamberlain should have been on notice about the IRS's efforts against similar tax shelters.[23] See *Smith v. Jones*, 278 Ga. 661, 662 (2) (604 SE2d 187) (2004) (conclusory affidavit unsupported by substantiating fact or circumstances is insufficient to raise a genuine issue of material fact); *Adams v. Carlisle*, 278 Ga. App. 777, 785 (3) (a) n.16 (630 SE2d 529) (2006) ("Allegations, conclusory facts, and conclusions of law cannot be utilized to support or defeat motions for summary judgment." (citation and punctuation omitted)). Thus, we conclude

---

[23] It does not appear from the record that any discovery has been taken of Chamberlain's knowledge about these issues during the relevant time period.

that the Court of Appeals erred in determining that the Coes failed, as a matter of law, to exercise reasonable diligence to discover Proskauer's allegedly fraudulent acts. See *Sanders*, 247 Ga. at 381 (3) ("Ordinarily, questions of whether the plaintiff could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury." (citation and punctuation omitted)).

Accordingly, we reverse the judgment of the Court of Appeals and remand the case with instruction to reverse the trial court's order and remand the case for further proceedings consistent with this opinion.

*Judgment reversed and case remanded with direction. All the Justices concur, except Bethel, J., disqualified.*

Decided September 7, 2022.

Certiorari to the Court of Appeals of Georgia — 360 Ga. App. 68.

*Robbins Alloy Belinfante Littlefield, Joshua B. Belinfante; Caldwell & Watson, Harry W. MacDougald; Loewinsohn Deary Simon Ray, Jeven R. Sloan*, for appellants.

*Troutman Pepper Hamilton Sanders, Harold D. Melton; Dentons US, Shari L. Klevens, Mark G. Trigg; Proskauer Rose, David M. Lederkramer; Williams & Connolly, Lisa S. Blatt*, for appellee.

*Stites & Harbison, Johannes S. Kingma, Jeffrey C. Hoffmeyer; Webb Daniel Friedlander, Laurie W. Daniel, Matthew D. Friedlander*, amici curiae.